# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

---

Solutions in Hometown Connections *et al.*,

*Plaintiffs-Appellants*,

v.

Kristi Noem *et al.*,

*Defendants-Appellees.*

---

On appeal from a denial of a preliminary injunction from the
United States District Court for the District of Maryland
Case No. 25-cv-885, Hon. Lydia K. Griggsby

## Corrected Brief for Appellants

Niyati Shah
Shalaka Phadnis
Asian Americans Advancing
  Justice—AAJC
1620 L St. NW, Suite 1050
Washington, DC 20036
(202) 296-2318

Jose Perez
Rex Chen
LatinoJustice PRLDEF
475 Riverside Dr., Suite 1901
New York, NY 10115
(212) 219-3360

Bradley Girard
Sarah M. Rich
Adnan Perwez
Robin F. Thurston
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

Nickole Durbin-Felix
LatinoJustice PRLDEF
4700 Millenia Blvd., Suite 500
Orlando, FL 32839
(321) 247-6657

*Counsel for Appellants*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Solutions in Hometown Connections, who is Plaintiff-Appellant, makes the following disclosure:

1. Is party a publicly held corporation or other publicly held entity?
   YES ☐   NO ☑

2. Does party/amicus have any parent corporations?
   YES ☐   NO ☑

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   YES ☐   NO ☑

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   YES ☐   NO ☑

5. Is party a trade association?   YES ☐   NO ☑

6. Does this case arise out of a bankruptcy proceeding?
   YES ☐   NO ☑

7. Is this a criminal case in which there was an organization victim?
   YES ☐   NO ☑

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Central American Resource Center, who is Plaintiff-Appellant, makes the following disclosure:

1. Is party a publicly held corporation or other publicly held entity?
   YES ☐   NO ☑

2. Does party/amicus have any parent corporations?
   YES ☐   NO ☑

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   YES ☐   NO ☑

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   YES ☐   NO ☑

5. Is party a trade association?   YES ☐   NO ☑

6. Does this case arise out of a bankruptcy proceeding?
   YES ☐   NO ☑

7. Is this a criminal case in which there was an organization victim?
   YES ☐   NO ☑


Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Coalition for Humane Immigrant Rights, who is Plaintiff-Appellant, makes the following disclosure:

1. Is party a publicly held corporation or other publicly held entity?
   YES ☐   NO ☑

2. Does party/amicus have any parent corporations?
   YES ☐   NO ☑

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   YES ☐   NO ☑

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   YES ☐   NO ☑

5. Is party a trade association?   YES ☐   NO ☑

6. Does this case arise out of a bankruptcy proceeding?
   YES ☐   NO ☑

7. Is this a criminal case in which there was an organization victim?
   YES ☐   NO ☑


Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Community Center for Immigrants, Inc., who is Plaintiff-Appellant, makes the following disclosure:

1. Is party a publicly held corporation or other publicly held entity?
   YES ☐   NO ☑

2. Does party/amicus have any parent corporations?
   YES ☐   NO ☑

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   YES ☐   NO ☑

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? YES ☐ NO ☑

5. Is party a trade association? YES ☐ NO ☑

6. Does this case arise out of a bankruptcy proceeding?
   YES ☐ NO ☑

7. Is this a criminal case in which there was an organization victim?
   YES ☐ NO ☑


Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, English Skills Learning Center, who is Plaintiff-Appellant, makes the following disclosure:

1. Is party a publicly held corporation or other publicly held entity?
   YES ☐ NO ☑

2. Does party/amicus have any parent corporations?
   YES ☐ NO ☑

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? YES ☐ NO ☑

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? YES ☐ NO ☑

5. Is party a trade association? YES ☐ NO ☑

6. Does this case arise out of a bankruptcy proceeding?
   YES ☐ NO ☑

7. Is this a criminal case in which there was an organization victim?
   YES ☐ NO ☑


Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Michigan Organizing Project, d/b/a Michigan United, who is Plaintiff-Appellant, makes the following disclosure:

1. Is party a publicly held corporation or other publicly held entity?
   YES ☐ NO ☑

2. Does party/amicus have any parent corporations?
   YES ☐ NO ☑

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   YES ☐   NO ☑

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? YES ☐   NO ☑

5. Is party a trade association?   YES ☐   NO ☑

6. Does this case arise out of a bankruptcy proceeding?
   YES ☐   NO ☑

7. Is this a criminal case in which there was an organization victim?
   YES ☐   NO ☑

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Hebrew Immigrant Aid Society and Council Migration Service of Philadelphia, d/b/a HIAS Pennsylvania, who is Plaintiff-Appellant, makes the following disclosure:

1. Is party a publicly held corporation or other publicly held entity?
   YES ☐   NO ☑

2. Does party/amicus have any parent corporations?
   YES ☐   NO ☑

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   YES ☐   NO ☑

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? YES ☐   NO ☑

5. Is party a trade association?   YES ☐   NO ☑

6. Does this case arise out of a bankruptcy proceeding?
   YES ☐   NO ☑

7. Is this a criminal case in which there was an organization victim?
   YES ☐   NO ☑

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Immigrant Law Center of Minnesota, who is Plaintiff-Appellant, makes the following disclosure:

1. Is party a publicly held corporation or other publicly held entity?
   YES ☐   NO ☑

2. Does party/amicus have any parent corporations?
   YES ☐   NO ☑

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   YES ☐   NO ☑

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   YES ☐   NO ☑

5. Is party a trade association?   YES ☐   NO ☑

6. Does this case arise out of a bankruptcy proceeding?
   YES ☐   NO ☑

7. Is this a criminal case in which there was an organization victim?
   YES ☐   NO ☑


Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Instituto Del Progreso Latino, who is Plaintiff-Appellant, makes the following disclosure:

1. Is party a publicly held corporation or other publicly held entity?
   YES ☐   NO ☑

2. Does party/amicus have any parent corporations?
   YES ☐   NO ☑

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   YES ☐   NO ☑

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   YES ☐   NO ☑

5. Is party a trade association?   YES ☐   NO ☑

6. Does this case arise out of a bankruptcy proceeding?
   YES ☐   NO ☑

7. Is this a criminal case in which there was an organization victim?
YES ☐ NO ☑

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Massachusetts Immigrant and Refugee Advocacy Coalition, who is Plaintiff-Appellant, makes the following disclosure:

1. Is party a publicly held corporation or other publicly held entity?
YES ☐ NO ☑

2. Does party/amicus have any parent corporations?
YES ☐ NO ☑

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? YES ☐ NO ☑

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? YES ☐ NO ☑

5. Is party a trade association? YES ☐ NO ☑

6. Does this case arise out of a bankruptcy proceeding?
YES ☐ NO ☑

7. Is this a criminal case in which there was an organization victim?
YES ☐ NO ☑

# TABLE OF CONTENTS

**Page(s)**

Corporate Disclosure Statement ................................................................. i

Table of Authorities ......................................................................... ix

Glossary of Acronyms ..................................................................... xviii

Introduction ................................................................................ 1

Jurisdictional Statement .................................................................... 3

Issues Presented ........................................................................... 3

Statement of the Case ....................................................................... 5

    A.   DHS solicits grant participation and the Nonprofits receive CIGP grants. ........................................................ 5

    B.   DHS freezes CIGP funding, leaving the Nonprofits stranded mid-grant. .............................................................. 6

    C.   After the Nonprofits challenge the freeze of grant funds, DHS shutters the entire grant program. ........................... 7

    D.   The district court again concludes it likely lacks jurisdiction. ....................................................................... 9

Summary of Argument ..................................................................... 14

Standard of Review ......................................................................... 17

Argument .................................................................................. 17

I.   The district court has jurisdiction over this case. ................................. 17

    A.   The district court has jurisdiction to decide the Nonprofits' APA, constitutional, and ultra vires claims, and the Tucker Act does not apply. ........................................... 18

        1.   The court has jurisdiction to hear the Nonprofits' APA claims. ................................................................ 18

        2.   The court has freestanding jurisdiction to hear the Nonprofits' constitutional and ultra vires claims. ................ 32

    B.   Recent stay orders from the Supreme Court and panels of this Court do not change the result. .............................. 35

    C.   The CIGP termination is a reviewable agency action under the APA. ...................................................... 38

II.  The Nonprofits should be granted preliminary relief. ......................... 41

A.  The Nonprofits are likely to succeed on the merits of their claims because the CIGP termination violated the APA, the separation of powers, and was ultra vires. ............................. 43

1.  The Nonprofits are likely to succeed on their APA claims. ...................................................................... 44

2.  The Nonprofits are likely to succeed on their constitutional and ultra vires claims. ................................... 49

B.  The Nonprofits are suffering irreparable harm. ........................... 49

C.  The public interest and balance of the equities tip decisively in the Nonprofits' favor. ............................... 55

Conclusion ................................................................................... 57

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967) ............................................................... 39

*Aids Vaccine Advoc. Coal. v. U.S. Dep't of State,*
    No. 25-cv-00400, 2025 WL 752378 (D.D.C. Mar. 10, 2025)............... 36

*Air Evac EMS, Inc. v. McVey,*
    37 F.4th 89 (4th Cir. 2022).................................................... 52

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon,*
    No. 25-1281, 2025 WL 1232337 (4th Cir. 2025)................................ 36

*Ancient Coin Collectors Guild v. CBP,*
    698 F.3d 171 (4th Cir. 2012) ......................................... 33, 44

*Armstrong v. Exceptional Child Ctr., Inc.,*
    575 U.S. 320 (2015) ........................................... 3, 32, 37, 49

*Bakker v. Grutman,*
    942 F.2d 236 (4th Cir. 1991) ............................................. 42

*Beacon Assocs. v. Apprio, Inc.,*
    308 F.Supp.3d 277 (D.D.C. 2018) ..................................... 52

*Bell v. Hood,*
    327 U.S. 678 (1946) ............................................................. 32

*Bennett v. Spear,*
    520 U.S. 154 (1997) ............................................................. 38

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988) ...................... 12, 18, 19, 21, 22, 28, 29, 31, 32, 55

*Bowen v. Mich. Acad. of Fam. Physicians,*
    476 U.S. 667 (1986) ............................................................. 38

*Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*,
369 F.3d 385 (4th Cir. 2004) .............................................................. 43

*City & Cnty. of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ....................................................... 48

*City of Houston v. Dep't of Hous. & Urb. Dev.*,
24 F.3d 1421 (D.C. Cir. 1994) ....................................................... 54

*City of New York v. U.S. Dep't of Defense*,
913 F.3d 423 (4th Cir. 2019) .......................................................... 41

*Climate United Fund v. Citibank N.A.*,
No. 1:25-cv-00698, 2025 WL 842360 (D.D.C. Mar. 18, 2025)............ 54

*Clinton v. City of New York*,
524 U.S. 417 (1998) ......................................................................... 48

*Cnty. Bd. of Arlington Cnty., Va. v. Express Scripts Pharmacy, Inc.*,
996 F.3d 243 (4th Cir. 2021) .......................................................... 42

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) ......................................................................... 39

*Dep't of Educ. v. California*,
145 S.Ct. 966 (2025) .............................................. 2, 35, 36, 54

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ............................................................................. 41

*E. Enters. v. Apfel*,
524 U.S. 498 (1998) ......................................................................... 25

*E. Tenn. Nat. Gas Co. v. Sage*,
361 F.3d 808 (4th Cir. 2004) .......................................................... 51

*FEC v. Ted Cruz for Senate,*
    596 U.S. 289 (2022) ............................................................ 48

*Great-West Life & Annuity Ins. Co. v. Knudson,*
    534 U.S. 204 (2002) ............................................................ 35

*HIAS, Inc. v. Trump,*
    985 F.3d 309 (4th Cir. 2021) .............................................. 53

*Hispanic Affs. Project v. Acosta,*
    901 F.3d 378 (D.C. Cir. 2018) ........................................... 41

*In re Aiken Cnty.,*
    725 F.3d 255 (D.C. Cir. 2013) ........................................... 48

*In re Microsoft Corp. Antitrust Litig.,*
    333 F.3d 517 (4th Cir. 2003) .............................................. 42

*Ingersoll-Rand v. United States,*
    780 F.2d 74 (D.C. Cir. 1985) ............................................. 26

*Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Lab.,*
    358 F.3d 40 (D.C. Cir. 2004) ............................................. 46

*Jones v. Calvert Grp., Ltd.,*
    551 F.3d 297 (4th Cir. 2009) .............................................. 34

*Katz v. Cisneros,*
    16 F.3d 1204 (Fed. Cir. 1994) ........................................... 26

*Larson v. Domestic & Foreign Com. Corp.,*
    337 U.S. 682 (1949) ............................................................ 44

*League of Women Voters of N.C. v. North Carolina,*
    769 F.3d 224 (4th Cir. 2014) .............................................. 43

*League of Women Voters of U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ................................. 50

*LeBlanc v. United States,*
    50 F.3d 1025 (Fed. Cir. 1995) ........................... 33

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) ..................................... 40, 41

*Lummi Tribe of the Lummi Rsrv. v. United States,*
    870 F.3d 1313 (Fed. Cir. 2017). ......................... 28

*Maine Cmty. Health Options v. United States,*
    590 U.S. 296 (2020) ......................... 13, 19, 22, 28

*Mannat v. United States,*
    48 Fed. Cl. 148 (2000) ..................................... 34

*Marin Audubon Soc'y v. FAA,*
    121 F.4th 902 (D.C. Cir. 2024) ......................... 48

*Md. Dep't of Hum. Res. v. U.S. Dep't of Health & Hum. Servs.,*
    763 F.2d 1441 (D.C. Cir. 1985) ..................... 19, 27

*Megapulse, Inc. v. Lewis,*
    672 F.2d 959 (D.C. Cir. 1982) ..................... 11, 26

*Merrill v. Milligan,*
    142 S.Ct. 879 (2022) ....................................... 35

*Mt. Valley Pipeline, LLC v. 6.56 Acres,*
    915 F.3d 197 (4th Cir. 2019) ................... 50, 51, 54

*N.Y. Stock Exchange LLC v. SEC,*
    2 F.4th 989 (D.C. Cir. 2021) ............................. 39

*Nat'l Fed'n of Indep. Bus. v. OSHA.*,
  595 U.S. 109 (2022) ............................................................ 48

*Nat'l Lifeline Ass'n v. FCC*,
  No. 18-1026, 2018 WL 4154794 (D.C. Cir. Aug. 10, 2018) ............... 51

*Nat'l Veterans Legal Serv. Prog. v. U.S. Dep't of Def.*,
  990 F.3d 834 (4th Cir. 2021) ................................................. 41

*New York v. DHS*,
  969 F.3d 42 (2d Cir. 2020) .................................................... 57

*New York v. Trump*,
  133 F.4th 51 (1st Cir. 2025) .................................................. 41

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................ 55

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ........................................................ 40, 41

*Ohio v. EPA*,
  603 U.S. 279 (2024) ............................................................ 43

*Open Cmtys. All. v. Carson*,
  286 F.Supp.3d 148 (D.D.C. 2017) ......................................... 56

*Portsmouth Redevelopment & Housing Auth. v. Pierce*,
  706 F.2d 471 (4th Cir. 1983) ............................................ 25, 29

*Real Time Med. Sys. v. PointClickCare Techs.*,
  131 F.4th 205 (4th Cir. 2025) ............................................... 52

*Rich v. United States*,
  811 F.3d 140 (4th Cir. 2015) ................................................. 17

*Richardson v. Morris*,
409 U.S. 464 (1975) .................................................... 20, 21

*Rick's Mushroom Serv., Inc. v. United States*,
521 F.3d 1338 (Fed. Cir. 2008) ........................................ 24

*Rodriguez v. Robbins*,
715 F.3d 1127 (9th Cir. 2013) ......................................... 56

*Roe v. Dep't of Defense*,
947 F.3d 207 (4th Cir. 2020) ....................................... 55, 56

*Sharp v. Weinberger*,
798 F.2d 1521 (D.C. Cir. 1986) .................................... 26, 34

*St. Bernard Par. Gov't v. United States*,
134 Fed. Cl. 730 (2017) .............................................. 22, 23

*Strickland v. United States*,
32 F.4th 311 (4th Cir. 2022) ............................................ 33

*Sustainability Inst. v. Trump*,
No. 25-1575, 2025 WL 1587100 (4th Cir. 2025) ........................ 36, 37

*Texas v. EPA*,
829 F.3d 405, 424 (5th Cir. 2016) ...................................... 43

*Tootle v. Sec'y of Navy*,
446 F.3d 167 (D.C. Cir. 2006) .......................................... 38

*Train v. City of N.Y.*,
420 U.S. 35 (1975) ...................................................... 44

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
967 F.2d 598 (D.C. Cir. 1992) ....................................... 24, 34

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*,
    665 F.3d 1339 (D.C. Cir. 2012) ........................................... 47

*United States v. Bormes*,
    568 U.S. 6 (2012) .............................................................. 26

*United States v. J & E Salvage Co.*,
    55 F.3d 985 (4th Cir. 1995) ......................................... 25, 26

*United States v. M/V Sanctuary*,
    540 F.3d 295 (4th Cir. 2008) ............................................ 17

*United States v. Mitchell*,
    463 U.S. 206 (1983) .......................................................... 33

*United States v. South Carolina*,
    720 F.3d 518 (4th Cir. 2013) ............................................ 42

*United States v. Testan*,
    424 U.S. 392 (1976) .......................................................... 37

*Webster v. Doe*,
    486 U.S. 592 (1988) ...................................................... 37, 38

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) .......................................................... 39

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .............................................................. 50

*Woonasquatucket River Watershed Council v. USDA*,
    No. 1:25-cv-00097, 2025 WL 1116157 (D.R.I. Apr. 15, 2025)............ 53

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) .......................................................... 48

# TABLE OF AUTHORITIES—continued

Page(s)

## Constitution, Statutes, Rules, and Regulations

U.S. Const., art. I, § 8 ................................................. 47

U.S. Const., art. I, § 9 ................................................. 47

2 U.S.C. § 683 ........................................................... 44

2 U.S.C. § 684 ........................................................... 44

5 U.S.C. § 551 ................................................... 4, 39, 40

5 U.S.C. § 702 ............................................... 3, 4, 18, 19

5 U.S.C. § 704 ..................................................... 19, 31

5 U.S.C. § 705 ........................................................... 42

5 U.S.C. § 706 ......................................... 43, 44, 48, 49

6 U.S.C. § 111 ........................................................... 47

6 U.S.C. § 271 ........................................................... 47

28 U.S.C. § 1292 .......................................................... 3

28 U.S.C. § 1331 .......................................................... 3

28 U.S.C. § 1491 ........................................ 3, 20, 24, 31, 32

31 U.S.C. § 1301 ......................................................... 45

31 U.S.C. § 6303 ......................................................... 22

31 U.S.C. § 6304 ......................................................... 23

2 C.F.R. § 200.340 .................................................................. 45, 46

2 C.F.R. §§ 200 *et seq* ............................................................. 45

Consolidated Appropriations Act of 2023,
    Pub. L. No. 117-328, 136 Stat. 4459 (Dec. 29, 2022) ......................... 44

Further Consolidated Appropriations Act of 2024,
    Pub. L. No. 118-47, 138 Stat. 460 (Mar. 23, 2024) ........................... 44

Guidance for Federal Financial Assistance,
    89 Fed. Reg. 30046 (Apr. 22, 2024) .............................................. 45, 46

Guidance for Grants and Agreements,
    85 Fed. Reg. 49506 (Aug. 13, 2020) ...................................................... 46

## Other Authorities

*Grant Program Impact,* U.S. Citizenship and Immigr. Servs.,
    https://perma.cc/WZM4-EGLF ........................................................ 5, 56

Restatement (Second) of Conts. (Am. L. Inst. 1981) .................................... 31

# GLOSSARY OF ACRONYMS

**Plaintiffs-Appellants**

- CARECEN: Central American Resource Center

- CCI: Community Center for Immigrants, Inc.

- CHIRLA: Coalition for Humane Immigrant Rights

- ESLC: English Skills Learning Center

- HIAS PA: Hebrew Immigrant Aid Society and Council Migration Service of Philadelphia

- IDPL: Instituto del Progreso Latino

- ILCM: Immigrant Law Center of Minnesota

- MIRA: Massachusetts Immigrant and Refugee Advocacy Coalition

- SHC: Solutions in Hometown Connections

**Defendants-Appellees**

- DHS: Department of Homeland Security

- USCIS: United States Citizenship and Immigration Services

**Miscellaneous**

- CIGP: Citizenship and Integration Grant Program

- CARING: Community and Regional Integration Network Grants

- CINAS: Citizenship Instruction and Naturalization Application Services Grants

- LPRs: Lawful Permanent Residents

# INTRODUCTION

For years, Congress has expressly funded the Citizenship and Integration Grant Program, a program established and administered by the Department of Homeland Security to help lawful permanent residents through the intensive process of applying for citizenship. Notwithstanding this congressional direction or that the current grants are mid-cycle, earlier this spring, DHS abruptly froze and then terminated the entire program. Nonprofit-Appellants, entities that received CIGP grants, turned to the district court, claiming that the decision was unconstitutional, ultra vires, and violated the Administrative Procedure Act. They sought preliminary equitable relief halting the termination so they could continue serving their clients.

DHS barely defended its actions on the merits, instead insisting that the district court was powerless to stop it from terminating a congressionally funded program. The district court agreed—holding that it likely lacked jurisdiction to consider the Nonprofits' claims. Specifically, the court concluded that the Nonprofits' claims for equitable relief were *really* requests for money damages, so the Tucker Act stripped it of jurisdiction. The court also mischaracterized the Nonprofits' claims as grievances with DHS's operation and management of CIGP, not reviewable agency action. Both conclusions were wrong and should be reversed.

This case arises at a time when courts are determining the contours of the interaction between the Tucker Act and the APA, a task ostensibly complicated by the Supreme Court's stay order in *Department of Education v. California,* 145 S.Ct. 966 (2025). But one paragraph of passing analysis in an emergency stay order did not wipe out four decades of relevant caselaw, nor did it purport to. Under longstanding precedents, the analysis is straightforward: If a plaintiff seeks money damages from the Government—specific sums to compensate for harms suffered—the case must be heard by the Court of Federal Claims. But if a plaintiff seeks forward-looking equitable relief, the district court retains jurisdiction— even if equitable relief results in the payment of money. And because the Court of Federal Claims cannot exercise jurisdiction over equitable constitutional and ultra vires claims, those claims must remain with the district court, lest plaintiffs lose any forum altogether.

At bottom, DHS's position is that any time a federal grantee is wronged, only the Court of Federal Claims has jurisdiction to hear ensuing disputes. So, according to DHS, if grants are terminated for racially discriminatory reasons or First Amendment protected activity, grantees can receive their past-due reimbursements and nothing else. And even when those decisions are made en masse, review must be piecemeal. Put simply, DHS argues that when it violates clear congressional and even constitutional commands,

relief is limited to an order from the Court of Federal Claims to pay past-due sums and district courts are forbidden to exercise equitable authority (both inherent and under the APA) to enjoin the illegal activity. That cannot be.

## JURISDICTIONAL STATEMENT

The district court has jurisdiction over this case because it raises federal questions. 28 U.S.C. § 1331. Specifically, the Nonprofits brought claims under the APA, 5 U.S.C. § 702, and under the court's equitable jurisdiction over constitutional and ultra vires claims challenging actions of federal officials, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

Because the Nonprofits appeal the denial of a preliminary injunction, this Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

**I.** The APA gives district courts jurisdiction to hear claims for "relief other than money damages." 5 U.S.C. § 702. Under the Tucker Act, the Court of Federal Claims has jurisdiction to hear "express or implied contract" claims against the government for money damages. *See* 28 U.S.C. § 1491(a). The Court of Federal Claims has no jurisdiction to hear constitutional and ultra vires claims that seek equitable relief. When DHS terminated an entire grant program mid-grant, the Nonprofits brought APA, separation-of-powers, and ultra vires claims seeking only equitable

relief. The nonprofits do not seek—nor could they receive—money damages. The first issue presented is whether the district court erred in concluding that the Tucker Act likely stripped jurisdiction over all the Nonprofits' claims.

**II.** The APA allows district courts to consider challenges to agency actions, *see* 5 U.S.C. § 702, which include agency orders and denials of relief, 5 U.S.C. § 551(13). "Relief" includes a "grant of money." *Id.* § 551(11)(A). The APA does not allow claims of generalized mismanagement or policy grievances. The Nonprofits challenge specific DHS orders terminating an entire grant program and the resulting denial of grant funds. The second issue presented is whether the district court erred in concluding that it likely lacked jurisdiction to consider the Nonprofits' APA claims because they are "a wholesale, programmatic challenge to the Government's operation and management" of the grant program. JA748.

**III.** The district court denied the Nonprofits' motion for preliminary relief on the jurisdictional issues alone. DHS forfeited one of the merits issues. And the Nonprofits showed how they are irreparably harmed (a point with which the district court indicated agreement) and why the balance of the equities and public interest strongly support preliminary relief. The third issue presented is whether this Court should grant the Nonprofits' motion.

4

## STATEMENT OF THE CASE

### A. DHS solicits grant participation and the Nonprofits receive CIGP grants.

In 2009, USCIS—a component of DHS—created the Citizenship and Integration Grant Program to provide "English language and civics instruction, legal assistance with naturalization applications, and … community space for immigrant [integration]" to qualified lawful permanent residents (LPRs).[1] CIGP's goal "is to expand the availability of high-quality citizenship preparation services for [LPRs] across the nation and to provide opportunities for immigrants to gain the knowledge and skills necessary to integrate into the fabric of American society." JA60. CIGP funding includes Citizenship Instruction and Naturalization Application Services (CINAS) grants, which help organizations offer citizenship instruction and assistance filing applications for naturalization, and Community and Regional Integration Network (CARING) Grants, which are similar but focused on helping the most-vulnerable immigrants, including refugees, asylees, and trafficking victims. JA115.

---

[1] *Grant Program Impact,* U.S. Citizenship and Immigr. Servs., https://perma.cc/WZM4-EGLF. It appears that DHS replaced "integration" with "assimilation" when discussing the CIGP. The Nonprofits are unaware when, or why, that change was made.

Appellants are ten nonprofit organizations that responded to DHS's invitation to apply for, and were awarded, CIGP grants. JA31-32. The Nonprofits built out two-year programs to provide start-to-finish naturalization services to LPRs, including citizenship and English language classes, JA502, legal representation, JA546, assistance with naturalization applications, JA557, and naturalization-interview preparation, JA511. They hired dedicated staff, JA542-543, developed educational materials, JA531, and some subcontracted with third parties, JA557, all to provide high-quality citizenship and naturalization services. The Nonprofits serve a variety of communities, including several that have been historically underserved—requiring the Nonprofits to invest time and other resources to establish trust and build their reputations as service providers. *See, e.g.*, JA518-519; JA544. For some of the Nonprofits, there are no other organizations performing these critical services in their locations. *See* JA525; JA544. Some of the Nonprofits have been consistent CIGP grant recipients. *See, e.g.*, JA532. And DHS has never indicated that any of the Nonprofits failed to carry out their responsibilities under their grants.

## B. DHS freezes CIGP funding, leaving the Nonprofits stranded mid-grant.

In January, DHS Secretary Kristi Noem issued a memorandum freezing "all Department grant disbursements" to nonprofits if the grants "touch in

any way on immigration." JA229. Secretary Noem gave three reasons: (1) concerns that the grants may be "encouraging or inducing illegal immigration" or the "illegal harboring of illegal aliens"; (2) "concerns that there may be racially discriminatory language in certain grants"; and (3) concerns that the grants "may not be an efficient use of government resources." JA229.

One week later, USCIS sent the Nonprofits a boilerplate letter stating that, following Secretary Noem's memo, it had frozen their grant funds. JA230. The letter stated that USCIS "recognize[d] this will have an impact on your organization" but was "unable to provide a timeline on this freeze." JA230. The freeze of the Nonprofits' CIGP funds immediately created serious cash-flow problems, leading some of them to start laying off staff, JA514, and limiting or ending classes they had been offering, JA578.

### C. After the Nonprofits challenge the freeze of grant funds, DHS shutters the entire grant program.

In March, the Nonprofits sued and sought preliminary relief, arguing that the Noem Memo and the Freeze Letter violated the APA. *See* JA727, n.1. Two days after the Nonprofits filed their first motion for preliminary relief, DHS eliminated CIGP entirely. JA231-232. In a single email sent to all CIGP grantees, DHS stated that "effective immediately" the grantees were to "end all work." JA232. The email stated that "DHS has determined

that the scope of work performed under this award no longer effectuates the program goals and the Department's priorities." JA232. The email did not state what had changed—why the grant awards "no longer effectuate[d]" CIGP's goals, what the relevant program goals or DHS policies were, or that those policies had somehow changed (and if so, how). *See* JA232. Nevertheless, the email ordered the grantees to "cease all federally funded work" and stated that any CIGP costs going forward would not be reimbursed. JA232.

Each Nonprofit also received a boilerplate letter informing them that DHS would reimburse them for services performed until the termination date. *See, e.g.*, JA234. DHS gave the Nonprofits 30 days to submit a request for limited closeout costs allowed under 2 C.F.R. § 200.472. JA234.

The district court denied the Nonprofits' motion. Op. 20 (ECF 46). The court held that the FY2023 Nonprofits were unlikely to succeed on the merits of their APA claims because the Tucker Act likely required their claims to be brought in the Court of Federal Claims. *Id*. at 15. Specifically, the court relied primarily on the allegations in the complaint—filed before DHS dismantled the CIGP—and found that past-due sums for completed work were the heart of the dispute. *Id*. at 16. In response to the Nonprofits' arguments that the principal harm was not being able to continue their naturalization programs going forward and seek reimbursement in the

future, the court concluded that future work and reimbursement were not at issue because DHS had, as part of the challenged termination, ordered that the Nonprofits cease their grant work. *Id*. at 19. The district court did not decide whether it likely had jurisdiction over the FY2024 plaintiff, ILCM. *Id*. at 21. Instead of pursuing piecemeal litigation, the Nonprofits sought and received leave to amend their complaint (which added an additional FY2024 grantee) and file a renewed motion on behalf of all plaintiffs. JA21-24.

### D. The district court again concludes it likely lacks jurisdiction.

The Nonprofits' amended complaint and renewed motion for a preliminary injunction or stay under Section 705 of the APA made clear that they were challenging the elimination of CIGP and the devastating effect that caused for their citizenship and naturalization programs going forward. JA20; JA56-57. The Nonprofits explained that the sources of their rights were the Constitution, the APA, and various statutes and regulations—not the terms of the grant agreements. PI Br. 11 (ECF 53-1). The Nonprofits explained that because DHS had stated that it was going to reimburse grantees for all past-due sums, the Nonprofits were not seeking past-due money damages. *See, e.g.*, JA56-57. They explained that, as a result, the Court of Federal Claims could not hear the Nonprofits' claims.

PI Br. 12-13. And they explained that the court independently had jurisdiction over the Nonprofits' separation-of-powers and ultra vires claims. PI Br. 14.

In response, DHS argued that this is a case about money damages. Opp. Br. 12 (ECF 63). Without identifying any past-due sums at issue, and without acknowledging that DHS had said that it would reimburse for all completed work as part of the CIGP dismantling, DHS argued that the Nonprofits sought backward-looking relief. *Id.* So, according to DHS, the Tucker Act stripped the district court of jurisdiction—not only over the Nonprofits' APA claims, but their constitutional and ultra vires claims too. *Id.* at 11. DHS also argued that the court did not have jurisdiction under the APA because the Nonprofits' challenge was a "broad programmatic attack." *Id.* at 16.

At oral argument, when the Nonprofits explained that DHS did not even bother to respond to the Nonprofits' arbitrary-and-capricious argument (thus forfeiting it), the district court noted "the plaintiffs have a very valid point." JA642. And the district court acknowledged that the Nonprofits "made [their] point on irreparable harm" and that "there's a pretty solid record on that point." JA671-672. Nonetheless, the district court denied the Nonprofits' renewed motion. JA712.

The court concluded that the Nonprofits were unlikely to succeed on the merits for two reasons.

**1.** The court held that it likely did not have subject-matter jurisdiction over the claims of the FY23 Nonprofits (8 of the 10 plaintiffs). JA743. The court applied the two-part test from *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982), looking to the source of the rights at issue and the relief sought to determine whether the "essence" of the claim was contractual. *See* JA743**.**

First, the court concluded that the source of the rights for the FY23 Nonprofits' APA claims was their grant agreements because the Nonprofits "allege and acknowledge" that they were grant recipients and that the loss of the grants harmed them. JA744.[2] The court then rejected the Nonprofits' argument that the source of their legal rights was constitutional, statutory, and regulatory. JA744-745. The court reasoned that because the grants incorporated the Uniform Guidance regulations, the grants remained the source of those rights (even though the grants themselves explained that the regulations, not grant terms, control). JA744-745. As to the

---

[2] Despite applying its conclusion to the FY23 Nonprofits' "APA, separation of powers and ultra vires claims," the court analyzed only whether the APA's waiver of sovereign immunity precluded jurisdiction. *See* JA743 ("[t]o determine whether this Court has subject-matter jurisdiction over the FY 23 Plaintiffs' APA claims . . . .").

constitutional and statutory rights at issue, the court briefly addressed the merits of each argument instead of applying *Megapulse* or any other jurisdictional analysis. *See* JA744-746.

Second, the court stated that it was "clear" that the FY23 Nonprofits' APA, separation of powers, and ultra vires claims sought relief that was "monetary in nature and backward-looking." JA746. Yet as part of its backward-looking analysis, the court highlighted that the Nonprofits sought, among other things, "outstanding grant funds obligated to them for *future* grant work." JA746 (emphasis added). Turning to money damages— that is, specific past-due sums to which the Tucker Act might apply—the court relied on the very money that the Nonprofits explained was no longer at issue: reimbursement for completed work that DHS stated would be paid as part of the challenged termination. JA747.

The court addressed in passing the Nonprofits' argument that *future* reimbursement for *future* work was the core of this dispute. The court concluded that there would be no future costs because DHS had eliminated CIGP (again, the very action the Nonprofits challenged as unlawful). JA747. And in a footnote, the court concluded without any explanation that this forward-looking challenge "appears to be, at bottom, a request for specific performance." JA747 n.3. The court's analysis did not address—or even mention—*Bowen v. Massachusetts,* 487 U.S. 879 (1988), or *Maine*

*Community Health Options v. United States*, 590 U.S. 296 (2020). Nor did the court address the Nonprofits' argument that money damages are categorically unavailable under their separation-of-powers and ultra vires claims. *See* PI Br. 14.

**2.** The court then determined that it likely did not have jurisdiction over the APA claims of any of the Nonprofits because they did not challenge a "discrete agency action." JA747**.** Without explaining why—and despite the Nonprofits' having made plain that their challenge was to DHS's termination of CIGP—the court concluded that the Nonprofits "mount a wholesale, programmatic challenge to the Government's *operation and management* of the CIGP." JA748 (emphasis added).

**3.** The Court did not explain why it did not have jurisdiction to consider the Nonprofits' separate constitutional and ultra vires claims. For the FY23 Nonprofits, it stated only: "Given this, the Plaintiffs have also not shown that their separation of powers and ultra vires claims provide an independent basis for the Court to exercise jurisdiction in this case." JA746. And the Court did not mention the FY24 Nonprofits' separation-of-powers and ultra vires claims at all. Yet it concluded that it likely did not have jurisdiction to consider them.

## SUMMARY OF ARGUMENT

**I.** The district court has jurisdiction over the Nonprofits' APA, constitutional, and ultra vires claims.

**A.** The Nonprofits seek equitable relief—an order enjoining DHS from eliminating CIGP, a congressionally funded grant program. The requested relief would simply allow the Nonprofits to carry out their grant programs going forward. The Tucker Act—which requires certain claims for money damages against the Government to be brought in the Court of Federal Claims—cannot strip the district court's jurisdiction. The controlling question under the Tucker Act is whether a plaintiff seeks (or could receive) money damages. The Nonprofits do not seek any money damages. If there were any question, the Supreme Court has already held—twice—that the APA, not the Tucker Act, applies when plaintiffs seek prospective relief outlining an agency's future responsibilities under a grant program.

Regardless, the district court must retain jurisdiction over the Nonprofits' separation-of-powers and ultra vires claims. The Court of Federal Claims does not have equitable powers so cannot decide a claim unless the underlying source of law mandates monetary relief. There is no dispute that separation-of-powers and ultra vires claims do not allow monetary relief. So to strip the district court of jurisdiction of those claims would mean that no court could consider them.

**B.** Recent stay orders from the Supreme Court and this Court do not change that jurisdictional conclusion. Those orders all concluded that money damages likely were the relief at issue. Not so here. And to the extent that one of this Court's orders concluded that the Tucker Act stripped the district court of jurisdiction over constitutional and ultra vires claims, that conclusion was wrong and would leave no court with jurisdiction to consider those claims—itself a constitutional problem.

**C.** The district court was also wrong to conclude that it lacked jurisdiction under the APA for another reason—because, according to the court, the Nonprofits brought a broad, programmatic challenge to DHS's management of CIGP. The court's conclusion was unsupported by the APA's text or caselaw. DHS's discrete acts to eliminate CIGP are all "agency actions," so are reviewable under the APA. That DHS eliminated CIGP across the board, as opposed to grant-by-grant, makes its actions *more* suited to APA review, not less.

**II.** This Court should grant the Nonprofits preliminary relief. The district court denied the Nonprofits' motion on jurisdictional grounds alone so did not evaluate the factors for a preliminary injunction (or stay under Section 705 of the APA). The undisputed facts in the record show that the Nonprofits satisfy each.

**A.** The Nonprofits are likely to succeed on the merits. DHS forfeited any response to the Nonprofits' argument that terminating CIGP was arbitrary and capricious. That alone is grounds to find likelihood of success on the merits. What's more, eliminating CIGP disregarded statutory directives to operate the program and regulatory limits on terminating grants. And because DHS has refused to spend congressionally appropriated funds, it has violated the separation of powers and acted ultra vires.

**B.** Terminating CIGP has caused the Nonprofits irreparable harm. Among other things, the Nonprofits have had to cancel or pare down naturalization programs, lay off staff, turn away clients, and divert funds to fill the gaps left when DHS abruptly pulled the plug on CIGP. As a result, the Nonprofits are suffering reputational harm among their clients, subgrantees, and potential funders. And none of these harms can be remedied at final judgment. The Nonprofits do not have the financial ability to continue their naturalization programs. So a final judgment will either allow them the empty ability to seek reimbursement for grant work that they cannot do or continue their gutted naturalization programs. Either form of relief is no relief at all.

**C.** Finally, the public interest and balance of the equities weigh in the Nonprofits' favor. The public's interest is in agencies following the law. And while the Nonprofits risk continuing irreparable harm, DHS will not suffer

from an order directing it to follow the law and spend congressionally appropriated funds.

## STANDARD OF REVIEW

This Court reviews the denial of a preliminary injunction "for abuse of discretion, with factual determinations considered for clear error and legal conclusions considered de novo." *United States v. M/V Sanctuary*, 540 F.3d 295, 302 (4th Cir. 2008). Questions of subject-matter jurisdiction are reviewed de novo. *See Rich v. United States*, 811 F.3d 140, 144 (4th Cir. 2015). Because there are no facts in dispute and the district court denied the preliminary injunction on jurisdiction alone, this Court's review is de novo.

## ARGUMENT

### I. The district court has jurisdiction over this case.

The Nonprofits seek equitable and injunctive relief—specifically, an order enjoining DHS from eliminating an entire congressionally funded program. The Nonprofits' claims are squarely within the district court's power to adjudicate. DHS's arguments—and the district court's conclusion—that these claims must proceed in the Court of Federal Claims misconstrue (or ignore) controlling law, rely on a misreading of the Nonprofits' claims, and ignore that the district court had independent jurisdiction to decide the Nonprofits' separation-of-powers and ultra vires

claims. Emergency stay orders from the Supreme Court and this Court do not and cannot change that conclusion. And because the Nonprofits challenge discrete agency action, their claims are not broad programmatic attacks that cannot be reviewed under the APA.

### A. The district court has jurisdiction to decide the Nonprofits' APA, constitutional, and ultra vires claims, and the Tucker Act does not apply.

The Nonprofits' APA claims are claims for prospective relief—not disguised claims for money damages—that may proceed in district court. And because the Court of Federal Claims cannot exercise jurisdiction over the Nonprofits' separation-of-powers and ultra vires claims, those claims must remain in the district court.

#### 1. The court has jurisdiction to hear the Nonprofits' APA claims.

As the Supreme Court has squarely held, the APA "authorize[s] judicial review of the administration of" forward-looking grant programs—the type of program at issue here—even if the relief ordered might require the disbursement of funds to the plaintiff. *Bowen*, 487 U.S. at 898 (quotation marks omitted). That is because the APA waives sovereign immunity for claims "seeking relief other than money damages," unless another statute "expressly or impliedly forbids the relief" that is sought. 5 U.S.C. § 702. And judicial review under the APA is available if "there is no other adequate

remedy in a court." 5 U.S.C. § 704. The Nonprofits' APA claims seek prospective relief, not money damages; they are not breach-of-contract claims, so they are not precluded by the Tucker Act; and the Court of Federal Claims cannot grant the Nonprofits an adequate remedy.

**A.** First, the Nonprofits seek "relief other than money damages." 5 U.S.C. § 702. Money damages are specific sums of money to compensate a plaintiff for harms already suffered. *Bowen*, 487 U.S. at 895 (quoting *Md. Dep't of Hum. Res. v. U.S. Dep't of Health & Hum. Servs*, 763 F.2d 1441, 1446 (D.C. Cir. 1985)). Specific remedies like injunctive relief, on the other hand, "attempt to give the plaintiff the very thing to which he was entitled." *Id.* That is all the Nonprofits seek: injunctive relief that allows them to continue carrying out their grant work under CIGP. *See, e.g.*, JA581. To award the Nonprofits that relief, the Court would not need to order the payment of any money at all, and certainly not any money to compensate the Nonprofits for any past harms. That the requested injunctive relief might result in DHS paying money in the *future* does not transform these claims into claims for money damages. *Bowen*, 487 U.S. at 900-01. That is because money damages by definition cannot be forward-looking. *Maine Cmty. Health Options*, 590 U.S. at 326-27.

Nor can the Nonprofits' outstanding reimbursement requests be characterized as money damages. As part of eliminating CIGP, DHS

informed the Nonprofits that they would be reimbursed for all past work. *See, e.g.*, JA234. So by DHS's own telling, there are no outstanding reimbursements at issue. As a result, an injunction here could not give the Nonprofits an enforceable judgment for money.[3]

**B.** Second, no other statute impliedly or expressly forbids the relief sought. DHS argued, and the district court concluded, that this is really a contract case about money damages, so under the Tucker Act the Nonprofits must sue in the Court of Federal Claims. DHS misunderstands the Tucker Act and misconstrues the Nonprofits' claims.

**1.** The Tucker Act waives sovereign immunity for "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491. Cases under the Tucker Act must be brought in the Court of Federal Claims. *Richardson v. Morris*, 409 U.S. 464, 465 (1975) (per curiam). And because

---

[3] Even if the CIGP dismantling had not included full reimbursement, the Nonprofits would not be seeking money damages. Enjoining the CIGP elimination would give the Nonprofits the opportunity to *seek* reimbursement under their grant terms—which is what they request. JA632. DHS might deny or adjust a reimbursement under the operation of CIGP, and *that* might be the basis for a grantee to seek money damages. But that is not this case.

the Court of Federal Claims generally has no power to grant equitable relief, the Tucker Act applies only to claims for money damages. *Id.*

As just explained, the Nonprofits do not seek, nor could they receive, money damages. They seek only prospective, equitable relief: the ability to carry out their grant programs going forward. *See* JA56-57. So the Tucker Act cannot apply.

Even if there were some past-due sums at issue (setting aside DHS's admission to the contrary), because the Nonprofits seek an injunction stopping the CIGP dismantling, the district court has jurisdiction under the APA "to award complete relief." *Bowen*, 487 U.S. at 910. *Bowen* held that the ability to get some monetary relief under the Tucker Act does not "impliedly forbid[]" relief under Section 702 of the APA. *See id.* at 892 n.18. In *Bowen*, Massachusetts challenged HHS's disallowance of certain expenses under the Medicare grant-in-aid program. *Id.* at 887. Massachusetts sought the money it was owed and requested injunctive relief that would stop HHS from disallowing the category of expenses in the future. *Id.* The Court held that the district court did not award money damages when it reversed HHS's disallowance decision because it did not enter a money judgment for past-due sums. *Id.* at 909. Importantly, the Court also held that *even if* the district court's orders could be "construed in part as orders for the payment of money," the district court still had

jurisdiction under the APA. *Id.* at 910. That is because Massachusetts also sought equitable injunctive relief and the district court's APA jurisdiction "to award complete relief" was "not barred by the possibility that a purely monetary judgment may be entered" by the Court of Federal Claims. *Id.* And if there were any question of *Bowen*'s reach, *Maine Community Health Options* answered it: "The Tucker Act yields . . . when the Administrative Procedure Act . . . provides an avenue for relief." 590 U.S. at 323-24.

**2.** Instead of addressing that controlling precedent, DHS insists (and the district court concluded) that this is a contract case and that the Tucker Act provides the Court of Federal Claims with exclusive jurisdiction over all contract claims. DHS is doubly wrong.

First, the Nonprofits' grants are not contracts over which the Court of Federal Claims could exercise jurisdiction under the Tucker Act. An agreement with the Government is not an enforceable contract unless the agreement provides consideration—a direct, tangible benefit to the Government. *St. Bernard Par. Gov't v. United States*, 134 Fed. Cl. 730, 735 (2017), *aff'd on other grounds*, 916 F.3d 987 (Fed. Cir. 2019). Because procurement contracts provide "property or services for the *direct benefit* or use of the United States Government," 31 U.S.C. § 6303(1) (emphasis added), they generally may form the basis of a breach-of-contract claim. But "the principal purpose" of grant agreements "is to transfer a thing of value

[to the recipient] to carry out a public purpose … *instead of* acquiring property or services for the *direct benefit* or use of the United States Government," *id*. § 6304 (emphasis added). Although grant programs can advance U.S. policy interests, those are "generalized benefit[s]" to the Government and insufficient to show consideration. *Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F.Supp.3d 126, 133 (D.D.C. 2023).

DHS insists that CIGP grants are contracts but has not attempted to show that they provide the necessary consideration—that is, a direct benefit—to be enforceable in the Court of Federal Claims. This case is similar to *St. Bernard*, which involved a program under which local governments agreed to remove "hazards created by natural disasters," and would then be reimbursed by the government for allowed expenses. *See St. Bernard Par. Gov't*, 134 Fed. Cl. at 732-33. When the parish sought reimbursement for its work, the agency disagreed with some of the costs and reduced the reimbursement. *Id.* at 734. The parish brought a breach-of-contract claim under the Tucker Act, but the Court of Federal Claims dismissed it (at the *Government's* urging) for lack of jurisdiction. The court agreed with the Government that because the agreements did not provide a direct, tangible benefit to the government, there was no consideration and thus no enforceable contract. *Id.* So too here.

Second, even if the Nonprofits' grants might be considered contracts in some sense, that does not matter for the district court's jurisdiction. Addressing the Tucker Act, courts have used "contract" as shorthand to describe breach-of-contract claims properly brought in the Court of Federal Claims. But under the Tucker Act's jurisdiction, the question is not whether there is a contract between the parties. The question is whether the agreement "provide[s] a substantive right to recover money-damages." *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008).

Take the Constitution as a parallel. *See Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609, 613 (D.C. Cir. 1992) *abrogated on other grounds as recognized in Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017). Under the Tucker Act, the Court of Federal Claims has jurisdiction to hear "any claim against the United States founded . . . upon the Constitution." 28 U.S.C. § 1491(a)(1). The courts, however, have not concluded that *every* constitutional claim must go to the Court of Federal Claims. Instead, they have rightly concluded that constitutional claims for the payment of money damages—under the Takings Clause, for example— must go before the Court of Federal Claims. Constitutional claims that allow only equitable relief—including separation-of-powers claims, like the

Nonprofits bring here—*cannot* be heard by the Court of Federal claims because they do not allow money damages.[4]

**3.** To be sure, a plaintiff cannot plead around the Tucker Act by relabeling a breach-of-contract claim, for which money damages would be the appropriate remedy, as an equitable claim. For example, in *Portsmouth Redevelopment & Housing Authority v. Pierce*, the plaintiff originally sought a specific sum of money owed. 706 F.2d 471, 473 (4th Cir. 1983). This Court rejected the plaintiff's attempt to amend "and instead ask[] the court to 'direct an accounting of those sums owed.'" *Id.* And *United States v. J & E Salvage Co.* held that no matter what labels the parties gave the claims, they could be resolved only through application of black-letter contract law. 55 F.3d 985, 988-89 (4th Cir. 1995) ("In addition to arguing at length that either a unilateral or mutual mistake of fact prevented the formation of a contract, the government refers repeatedly to questions about party 'intent,' 'meeting of minds,' the 'binding force of the contract,' and the 'terms of the sale,' and relies heavily on contract cases.").

To "determine if the claim so clearly presents a disguised contract action that jurisdiction over the matter is properly limited" to the Court of Federal

---

[4] Indeed, the district courts have jurisdiction over even Takings Clause claims when only equitable relief is available. *See E. Enters. v. Apfel*, 524 U.S. 498, 521-22 (1998) (per curiam).

Claims, courts apply a two-part test. *See J & E Salvage Co.,* 55 F.3d at 988 (quoting *Megapulse*, 672 F.2d at 968). Under *Megapulse*, whether a claim is a breach-of-contract claim requires (1) that the source of the legal right asserted be contractual (and not statutory, regulatory, or constitutional), *and* (2) that the appropriate relief is money damages. *See* 672 F.2d at 968. Both considerations cut decisively in favor of district court jurisdiction in this case.

**a.** Courts determine the source of the rights at issue by "look[ing] to the true nature of the action.'" *Katz v. Cisneros*, 16 F.3d 1204, 1207 (Fed. Cir. 1994). The question is whether a legal claim requires the court to analyze contract terms under contract law, *see J & E Salvage Co.*, 55 F.3d at 988 or instead to examine constitutional provisions, statutes, and regulations. *See Sharp v. Weinberger*, 798 F.2d 1521 (D.C. Cir. 1986) (Scalia, J.). Put another way, the question is not whether a contract is the source of the *relationship* between the parties. *See, e.g., J & E Salvage Co.*, 55 F.3d at 988.[5] The question is whether the dispute is "*entirely* contained within the terms" of a contract. *Id.* (quoting *Ingersoll-Rand v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985) (emphasis added)).

---

[5] The Supreme Court has rejected this kind of surface-level analysis—holding that under the Tucker Act the controlling question is whether the Government is liable for money damages, not whether the Government has a legal obligation. *See United States v. Bormes*, 568 U.S. 6, 15-16 (2012).

Here, the Nonprofits challenge DHS's termination of CIGP as unconstitutional, contrary to law, and insufficiently explained and reasoned. The sources of the rights in this case are the Constitution, the APA, two appropriations acts, the Homeland Security Act, and the Uniform Guidance regulations. Resolution of these claims requires the district court to address constitutional and statutory limits on DHS's ability to unilaterally terminate an entire program for which Congress appropriated specific funds and to determine whether DHS violated the APA in doing so. The court does not need to interpret (or even look at) the grant terms. Nor does it need to apply contract law. In short, the Nonprofits' "claims arise under a federal grant program and turn on the interpretation" of the Constitution, statutes, and regulations "rather than on the interpretation of an agreement negotiated by the parties," so the Tucker Act does not apply. *Md. Dep't of Hum. Res.*, 763 F.2d at 1449.

**b.** The type of relief the Nonprofits seek—prospective, equitable relief—also makes plain that this is not a contract case. The Nonprofits principally seek an order enjoining DHS from eliminating CIGP, which would allow them to continue to carry out their CIGP-funded programs and later seek reimbursement for completed work. Because any dispersal of funds would be contingent on the Nonprofits' satisfying the grant terms in the future, and subject to adjustments (or even denial) under the CIGP's terms, those

27

funds are not guaranteed and would not be the result of this Court's order. Put another way, because CIGP created a "complex ongoing relationship," the forward-looking injunctive relief that the Nonprofits seek is "nonmonetary relief to clarify future obligations"—relief "that the Administrative Procedure Act 'is tailored' to." *Maine Cmty. Health Options*, 590 U.S. at 327 (quoting *Bowen*, 487 U.S. at 904-05, 904 n.39). That DHS might have to disburse indeterminate amounts of money in the *future*, after the Nonprofits have completed their work on the grants, does not turn the Nonprofits' claims from "an equitable action for specific relief" into an "action at law for damages." *Bowen*, 487 U.S. at 893. That is because the Nonprofits do not seek money damages—again, specific, calculated sums "designed to compensate for completed labors," which is "the Tucker Act's heartland." *Maine Cmty. Health Options*, 590 U.S. at 327. To categorize "strings-attached" grants, subject to "supervision and adjustment," as money damages "would strain the meaning of the term to its breaking point." *Lummi Tribe of the Lummi Rsrv. v. United States*, 870 F.3d 1313, 1318-19 (Fed. Cir. 2017).

To put it in practical terms, contrast a judgment in an artfully pleaded contact case to this case. In *Portsmouth*, for example, both a judgment for money damages and an injunction ordering the accounting of money owed would result in the same practical relief—payment of a set amount of money

under the terms of a specific contract. *See* 706 F.2d at 473. Likewise in Justice Scalia's hypotheticals in dissent in *Bowen*, there would be no practical difference between a judgment for a specific amount of money damages and an injunction ordering a party to pay that same sum. *See* 487 U.S. at 916. At the end of the day, both a money judgment and equitable relief would require the defendant to pay the same amount under the same terms of a contract. This case is quite different. If the Nonprofits' claims are relegated to the Court of Federal Claims, the only relief they could obtain would be, at most, reimbursements not yet paid for work completed up until the date of the termination of the CIGP—funds that the government readily acknowledges it must pay in any event. By contrast, a judgment entered by the district court against DHS would prevent DHS from unlawfully eliminating the entire CIGP going forward.

Despite all this, DHS has insisted that money damages, not equitable relief, are the only appropriate remedy here. But "it is no answer to suggest" money damages when a party's interest is "in planning future programs" and seeking future reimbursements. *Bowen*, 487 U.S. at 906. And despite many opportunities to do so, DHS has never explained what the money damages might be. Surely, if this case were about money damages—specific past-due sums—DHS would have been able to easily calculate those

amounts and explain them to the district court (and the Nonprofits). It has not.

Instead, DHS has pointed to the amount of *future* funds that remain on the Nonprofits' grants to support its argument that this is a Tucker Act case. Opp. Br. 4. But that runs headlong into *Bowen*. So DHS argues that those funds cannot be the subject of equitable relief because, under the CIGP dismantling, the Nonprofits are not allowed to incur new costs going into the future. But the Nonprofits challenge DHS's eliminating CIGP precisely because of the effect it has going into the future. DHS cannot escape the forward-looking injunctive relief at the heart of this case by saying that the unlawful act being challenged prohibits it.

What's more, in an attempt to write off the equitable relief that the Nonprofits actually seek, DHS contends that the desired equitable relief is, in reality, a request for specific performance. According to DHS, that proves that this is a breach-of-contract claim. That turns the second prong of *Megapulse* on its head. Whether equitable relief is specific performance (a contract-specific form of equitable relief) turns on whether the underlying claim is for a breach of contract. The mere fact that a plaintiff seeks forward-looking equitable relief, however, does not transform an APA claim into a breach-of-contract claim. If that were the rule, it is hard to see how a district court could have jurisdiction over *any* dispute involving a program under

which the government disburses funds—a result the Supreme Court rejected in *Bowen*, 487 U.S. at 905. In all events, "[s]pecific performance is by definition limited to the enforcement of contract duties," Restatement (Second) of Conts., ch. 16, topic 3, intro. note (Am. L. Inst. 1981), and DHS has failed to point to what specific contract duties the Nonprofits' requested injunction seeks to enforce.

**C.** Third, the Court of Federal Claims cannot provide adequate relief. The Court of Federal Claims generally has no power to grant equitable relief. *See Bowen*, 487 U.S. at 905 n.40. The Court of Federal Claims has the statutory power to grant incidental injunctive relief under 28 U.S.C. § 1491(a)(2). But that relief is limited to "orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records." *Id.* Those "certain equitable powers" are irrelevant "to actions involving review of an agency's administration" of a grant program. *Bowen*, 487 U.S. at 905 n.40.

Even if the Court of Federal Claims could have jurisdiction at an unknown future point for a claim challenging only a refusal to reimburse past-due sums, that does not mean the Nonprofits have an alternate adequate remedy *now*. Section 704 turns on whether there "is" an adequate remedy, not whether there could be in the future. *See* 5 U.S.C. § 704. And the Court of Federal Claims cannot "act in any fashion so long as the Federal

Government has not yet offset the disallowed amount from a future payment." *Bowen*, 487 U.S. at 907. Even Justice Scalia's dissenting opinion in *Bowen* agreed that the Court of Federal Claims cannot provide an adequate remedy when a grant recipient faces the "irreparable injury of either forgoing a reimbursable program or mistakenly expending . . . funds that will not be reimbursed." *Id.* at 926 (Scalia, J., dissenting). That is precisely what the Nonprofits face here.

## 2. *The court has freestanding jurisdiction to hear the Nonprofits' constitutional and ultra vires claims.*

In all events, the district court had jurisdiction over the Nonprofits' freestanding constitutional and ultra vires claims for equitable relief. Sovereign immunity does not bar either category of claim. And because neither claim allows for money damages the Court of Federal Claims would not have jurisdiction to consider either.

**A.** District courts have jurisdiction to grant equitable relief for constitutional violations. *See, e.g.*, *Bell v. Hood*, 327 U.S. 678, 683-84 (1946). That freestanding jurisdiction "is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong*, 575 U.S. at 327. And although the Tucker Act grants the Court of Federal Claims jurisdiction over claims arising under the Constitution, *see* 28 U.S.C. § 1491, it does so only for constitutional

claims that seek money damages under money-mandating constitutional provisions—those that "can fairly be interpreted as mandating compensation" from the government. *United States v. Mitchell*, 463 U.S. 206, 217 (1983) (citation omitted).

The Nonprofits claim that DHS's elimination of CIGP violates the separation of powers. They seek equitable relief—an order enjoining DHS from shutting down the congressionally funded program. JA581. And, as the Federal Circuit has explicitly held, a separation-of-powers claim is not money-mandating, so cannot be heard by the Court of Federal Claims. *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995). So even if jurisdiction in the Court of Federal Claims is exclusive under the Tucker Act for the Nonprofits' APA claims, their constitutional claim must remain with the district court.

**B.** So too for the Nonprofits' ultra vires claims. Ultra vires claims are nonstatutory, equitable claims alleging that the government acted beyond the bounds of its authority. *Ancient Coin Collectors Guild v. CBP*, 698 F.3d 171, 179 (4th Cir. 2012). Sovereign immunity does not apply in an ultra vires claim when a plaintiff sues federal officials in their official capacities for equitable relief alleging that they had "exceeded the scope of their authority" or "acted unconstitutionally." *Strickland v. United States*, 32 F.4th 311, 363 (4th Cir. 2022). And because ultra vires claims are inherently

equitable, they do not allow for money damages. *See Mannat v. United States*, 48 Fed. Cl. 148, 154 (2000). As a result, the Court of Federal Claims does not have jurisdiction to hear ultra vires claims at all. *Id.*

The Nonprofits' ultra vires claims allege that DHS acted beyond its authority when it dismantled the CIGP. The Nonprofits do not seek money damages (which they could not receive), they seek heartland ultra vires relief—an order enjoining DHS from acting contrary to the Constitution, statutes, and regulations.

**C.** The district court did not address any of this authority. Instead, it bootstrapped its reasoning onto its conclusion that because it likely lacked jurisdiction over the Nonprofits' APA claims, it likely lacked jurisdiction over the constitutional and ultra vires claims too. But jurisdiction must be considered on a claim-by-claim basis. *See, e.g.*, *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 305 (4th Cir. 2009), *abrogated on other grounds by Fort Bend Cnty. v. Davis*, 587 U.S. 541 (2019). And as the D.C. Circuit has correctly held, when the Tucker Act strips the district court of jurisdiction over breach-of-contract claims, the district court retains jurisdiction over constitutional (and statutory) claims, "even when the claims depend on the existence and terms of a contract with the government." *Transohio*, 967 F.2d at 610 (citing *Sharp v. Weinberger*, 798 F.2d 1521 (D.C. Cir. 1986) (Scalia, J.).

**B. Recent stay orders from the Supreme Court and panels of this Court do not change the result.**

The Supreme Court's stay order in *Department of Education v. California* does not change this analysis. In *California*, the plaintiffs challenged under the APA the termination of various individual grants, which the district court enjoined. 145 S.Ct. at 968. The Supreme Court's stay order concluded that the Department of Education was likely to succeed in showing that the district court "lacked jurisdiction to order the payment of money under the APA." *Id.* The Court acknowledged *Bowen*'s holding that district courts retain jurisdiction under the APA to order equitable relief, even when that relief will result in payment of money. *Id.* But, echoing Justice Scalia's concern from *Bowen* about artful pleading, the Court concluded that the district court had likely ordered enforcement of "a contractual obligation to pay money." *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).

*California* does not (and cannot) control here. As an initial matter, a stay order does not "make or signal any change" to existing law because it "is not a decision on the merits." *See Merrill v. Milligan*, 142 S.Ct. 879, 879 (2022) (Kavanaugh, J., concurring). So *California* could, at most, provide this Court guidance in a parallel case—as it did in a case challenging the same grant terminations as *California. See Am. Ass'n of Colls. for Tchr. Educ. v.*

*McMahon*, No. 25-1281, 2025 WL 1232337, at *1 (4th Cir. 2025) (applying *California* in a one-sentence stay of a district-court order). But the Nonprofits' claims are far from the claims in *California*. As already explained (at 30), the Nonprofits do not seek to enforce any contractual obligations. *Contra California*, 145 S.Ct. at 968. Nor do they seek any past-due reimbursements. *Contra id.* And where the plaintiffs in *California* brought only APA claims, the Nonprofits here bring freestanding constitutional and ultra vires claims. As just explained (at 32-34), the district court has jurisdiction over those claims no matter the holding under the APA—a point the Government has (rightly) conceded in a different case. *See Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-cv-00400, 2025 WL 752378, at *7 n.6 (D.D.C. Mar. 10, 2025). In all, *Bowen* and the text of the APA and Tucker Act still control this case—all of which make plain that the district court has jurisdiction and was wrong to conclude otherwise.

Likewise, this Court's stay order in *Sustainability Institute v. Trump*, decided on an expedited basis—without the benefit of full briefing—does not change the outcome here. *See* No. 25-1575, 2025 WL 1587100 (4th Cir. 2025). There, a panel of this Court concluded that plaintiffs' APA claims were substantively the same as those in *California. Id.* at *2. For reasons just explained, that is not the case here.

In addition, the stay panel concluded that the district court likely lacked jurisdiction over the plaintiffs' constitutional and ultra vires claims because it read the Tucker Act as precluding district court jurisdiction over equitable constitutional and ultra vires claims. *Id.* (relying on a Supreme Court quote that explained that "the express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others" (quoting *Armstrong*, 575 U.S. at 327-28)). Respectfully, that conclusion was wrong. *Armstrong* did not address constitutional claims; the Court reasoned that Congress intended to foreclose equitable relief when it provided the "sole remedy" for violations of Medicaid's requirements. 575 U.S. at 328. But the Tucker Act does not provide any remedy—sole or otherwise—it merely grants jurisdiction over certain claims for which money damages are the remedy. *See United States v. Testan*, 424 U.S. 392, 398 (1976). And "where Congress intends to preclude judicial review of constitutional claims[,] its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988). So the Tucker Act cannot strip the district courts of their equitable power to enjoin unlawful executive action. To conclude otherwise would leave plaintiffs with no forum to challenge ultra vires actions or agency actions that violate constitutional provisions that are not money-mandating. Like the D.C. Circuit, this Court should reject that extreme reading of the Tucker Act. *See Tootle v. Sec'y of Navy*, 446 F.3d 167, 169 (D.C. Cir. 2006).

This Court should not read the Tucker Act so expansively for another reason—the constitutional-avoidance doctrine. Any statute that could be read "to deny any judicial forum for a colorable constitutional claim" would raise a "serious constitutional question." *Webster*, 486 U.S. at 603 (*quoting Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 681 n.12 (1986)).

### C. The CIGP termination is a reviewable agency action under the APA.

The district court incorrectly concluded, with minimal analysis, that it likely lacked jurisdiction because the Nonprofits' APA claims amounted to "a wholesale, programmatic challenge to the Government's operation and management of the CIGP." JA748. But the Nonprofits challenge DHS's discrete acts to eliminate CIGP, not their general operation or management of the program. Those specific acts are "agency action" and the district court has subject matter jurisdiction over them under 5 U.S.C. § 702.[6]

**1.** "[T]he APA's 'basic presumption' [is] that anyone injured by agency action should have access to judicial review." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 824 (2024) (*quoting Abbott Labs.*

---

[6] DHS did not respond to the Nonprofits' showing that terminating CIGP was a "final agency action," nor did the district court address the issue. *See* JA747-748. In any case, terminating the CIGP is "final" as it represents the culmination of DHS's decisionmaking process, it determines rights and obligations, and legal consequences flow therefrom. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997).

*v. Gardner*, 387 U.S. 136, 140 (1967)). "'[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof. . . ." 5 U.S.C. § 551(13). It is a broad concept that "cover[s] comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001).

DHS "exercise[d] its power," *id.*, by terminating the CIGP altogether and refusing to spend appropriated funds. Specifically, DHS eliminated CIGP in three steps: first, the Noem Memo; second, an email announcing the across-the-board freeze of all CIGP funds; and third, a mass termination email and identical form letters, sent to all CIGP participants. Each is a reviewable agency action.

The Noem Memo is an agency action because it is an "order": "the whole or a part of a final disposition . . . of an agency in a matter other than rule making. . . ." 5 U.S.C. § 551(6). "In other words, an order is virtually any authoritative agency action other than a rule." *N.Y. Stock Exchange LLC v. SEC*, 2 F.4th 989, 992 (D.C. Cir. 2021). The Noem Memo authoritatively ordered DHS components to freeze all grant funds touching on immigration. JA229. Likewise, the CIGP freeze and termination letters are orders because they definitively stopped the payment of CIGP reimbursements. *See* JA230, JA237. The freeze and termination letters are agency action for an independent reason: they are "denial[s]" of "relief." As "relief" includes

"an agency . . . grant of money," 5 U.S.C. § 551(11)(A), the freeze and termination letters (which revoked grants of money) are denials of relief.[7]

In short, each element of DHS's termination of CIGP is an order or a denial of relief. Both "of those categories involve circumscribed, discrete agency actions, as their definitions make clear." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (*SUWA*). DHS's actions can thus be challenged under the APA. *See id.*

That plain, textual reading does not change simply because the decision to terminate CIGP applied equally to all grantees. An agency decision "applying some particular measure across the board"—like DHS's funding freeze and subsequent termination of all CIGP funding—can "of course be challenged under the APA." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2 (1990).

**2.** Instead of addressing the APA's text, the district court simply concluded that the Nonprofits "seek to mount a wholesale, programmatic challenge to the Government's operation and management of the CIGP." JA748. But the cases cited by the district court do not support that conclusion. The Nonprofits do not challenge the "continuing (and thus constantly changing) operations of" programs administered by DHS, *Lujan*,

---

[7] The freeze and termination letters may also constitute a "sanction," which includes an agency's "withholding of relief." 5 U.S.C. § 551(10)(B).

497 U.S. at 890, or DHS's "[g]eneral deficiencies in compliance" with broad mandates, *SUWA*, 542 U.S. at 66. They do not raise "generalized grievances asking [a court] to improve an agency's performance or operations," *City of New York v. U.S. Dep't of Defense*, 913 F.3d 423, 431 (4th Cir. 2019), nor claims of agency "mismanagement" of CIGP, *Nat'l Veterans Legal Serv. Prog. v. U.S. Dep't of Def.*, 990 F.3d 834 (4th Cir. 2021). Instead, the Nonprofits ask the Court to stop DHS from illegally ending CIGP by vacating and setting aside the discrete actions that terminated the program: the Noem Memo, the freeze letters, and the termination email and letters. Other circuits have concluded that similar claims involve reviewable discrete agency action. *See, e.g.*, *New York v. Trump*, 133 F.4th 51, 67-68 (1st Cir. 2025) (funding freezes across multiple agencies were "categorical in nature" and thus discrete agency action); *Hispanic Affs. Project v. Acosta*, 901 F.3d 378, 388 (D.C. Cir. 2018) (distinguishing *Lujan* where plaintiffs challenged "cabined and direct" "identified transgression" of statutes and regulations). And the Supreme Court found no barrier to reviewing DHS's termination of a different program. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 9 (2020). This Court should do the same.

## II. The Nonprofits should be granted preliminary relief.

The district court denied the Nonprofits' motion for preliminary relief solely on jurisdictional grounds and did not decide whether they met the

preliminary relief standard. But "what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Cnty. Bd. of Arlington Cnty., Va. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 254 (4th Cir. 2021) (citation omitted). This Court can reach and resolve those questions, which were fully briefed below and which the Nonprofits brief again here. *Id.* "[J]udicial economy" and the "unique circumstances" of this case—the Nonprofits are experiencing irreparable harm that will be compounded by additional delays—weigh heavily in favor of resolution of the jurisdictional questions and preliminary injunction motion in one opinion. *See id.*

In APA cases, courts may "issue all necessary and appropriate process" to "preserve status or rights pending conclusion of the review proceedings" when doing so is "necessary to prevent irreparable injury." 5 U.S.C. § 705. Likewise, a preliminary injunction can "protect the status quo" and "prevent irreparable harm" while the Court "render[s] a meaningful judgment on the merits." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (citation omitted). A preliminary injunction is appropriate if plaintiffs "demonstrate that (1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public

interest." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). The standard for relief under Section 705 is the same as for a preliminary injunction. *See, e.g.*, *Texas v. EPA*, 829 F.3d 405, 424, 435 (5th Cir. 2016).

### A. The Nonprofits are likely to succeed on the merits of their claims because the CIGP termination violated the APA, the separation of powers, and was ultra vires.

As an initial matter, in the district court DHS did not respond to the Nonprofits' arguments that the CIGP dismantling was arbitrary and capricious because it was neither "reasonable" nor "reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (internal quotation marks and citation omitted); *see generally* Opp. Br. 20. So DHS forfeited the argument. *See Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 399 (4th Cir. 2004). This Court does not need to go any further to decide that the Nonprofits are likely to succeed on the merits.

The Nonprofits also prevail because DHS's termination of CIGP contravenes multiple statutes, regulations, and the separation of powers. *See* 5 U.S.C. § 706(2)(A)-(C). And because DHS "'is not doing the business which the sovereign has empowered [it] to do,'" its actions are ultra vires. *Ancient Coin Collectors*, 698 F.3d at 179 (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949)).

### 1. *The Nonprofits are likely to succeed on their APA claims.*

*Appropriations Acts*: The CIGP termination is "not in accordance with," 5 U.S.C. § 706, the appropriations laws that Congress passed for fiscal years 2023 and 2024, which required Defendants to spend specific amounts of money for the CIGP. These acts unambiguously appropriate specific sums to DHS "for the Citizenship and Integration Grant Program." Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, 136 Stat. 4459, 4745 (Dec. 29, 2022); Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 612 (Mar. 23, 2024). This statutory mandate requires DHS to award and disburse the congressionally appropriated funds. *See Train v. City of N.Y.*, 420 U.S. 35, 41 (1975). But DHS terminated CIGP. And as a result, it is refusing to spend much of the appropriated funding. DHS does not have the authority to override Congress's determination of what money should be spent. *See id.* And if there were any question, the Impoundment Control and Antideficiency Acts make it clear—an agency cannot unilaterally withhold congressionally appropriated funding. *See* 2 U.S.C. §§ 683-684 (appropriated funds "shall be made available for obligation" unless the President transmits a special message to Congress and Congress rescinds the appropriation); 31 U.S.C. § 1301(a)

("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.").

*Uniform Guidance regulations*: The CIGP dismantling also contradicts the Uniform Guidance regulations adopted by DHS. 2 C.F.R. §§ 200 *et seq.* The Uniform Guidance allows DHS to terminate grants in only specific defined instances. 2 C.F.R. § 200.340(a). And the Uniform Guidance does not give DHS the power to terminate entire grant programs. *See id.* Yet DHS argues that it is allowed to cancel any (and apparently every) grant "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." *Id.* § 200.340(a)(4). DHS is wrong.

First, the Guidance allows termination only "if *an award* no longer effectuates the program goals or agency priorities." *Id.* § 200.340(a)(2) (2020) and § 200.340(a)(4) (2024) (emphasis added).[8] That applies if the grantee is no longer satisfying agency goals or priorities, not when an agency changes the program goals or its priorities. OMB's explanation of the 2020 revision to the Uniform Guidance makes that clear: "[I]f additional evidence reveals that a specific award objective is ineffective at achieving program goals, it may be in the government's interest to terminate the

---

[8] The Office of Management and Budget revised its guidance for federal financial assistance in 2024. Guidance for Federal Financial Assistance, 89 Fed. Reg. 30046 (Apr. 22, 2024). The revisions went into effect in October 2024, so apply to FY24 grants. *Id.* at 30046.

Federal award."[9] Guidance for Grants and Agreements, 85 Fed. Reg. 49506, 49507 (Aug. 13, 2020). There would be no need for "additional evidence" if an agency could simply change its priorities and cancel all grants deemed out of step with those new priorities. OMB was clear: one of the purposes of Section 200.340 is that "agencies are not able to terminate grants arbitrarily." *Id.* at 49509.

Second, even if the agency could change priorities on a whim and cancel grants, DHS has provided no evidence of any change in CIGP goals or DHS priorities. *See, e.g.*, JA234. An agency's "statement that there was a 'change in agency priorities,' without explanation, is not informative in the least; it is merely a reiteration of the decision" the agency already made. *Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Lab.*, 358 F.3d 40, 44 (D.C. Cir. 2004).

Finally, the Uniform Guidance allows termination only if it is "authorized by law." 2 C.F.R. § 200.340(a)(4). As just explained, DHS is not authorized to terminate CIGP; under the governing appropriations acts, it is required to keep it running.

---

[9] OMB's 2024 revisions similarly state that agencies can "terminate an award in the circumstances described in paragraph (a)(2) in the prior version of the guidance." *Id.*, 89 Fed. Reg. at 30089.

*Homeland Security Act*: When creating DHS, Congress forbade the department from "diminish[ing] or neglect[ing]" any of its "functions . . . not related directly to securing the homeland" without being authorized in advance by "a specific explicit Act of Congress." 6 U.S.C. § 111(b)(1)(E). At the same time, Congress tasked USCIS with "promoting instruction and training on citizenship responsibilities for [noncitizens] interested in becoming naturalized citizens of the United States." *Id.* § 271(f)(2). Since 2009, Congress has appropriated funds to CIGP for that exact purpose. DHS has not pointed to any "specific explicit Act of Congress" that allows it to "diminish[] or neglect[]" its citizenship and naturalization promotion duties. If anything, as already explained, the annual appropriation is "a specific explicit Act of Congress" that requires CIGP to continue.

**2.** Terminating the CIGP also violates the constitutional principle of separation of powers. The Constitution vests exclusive power over federal spending with Congress. U.S. Const., art. I, § 8, cl. 1; *see also id.,* art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law"). Put simply, Congress has "exclusive power over the federal purse." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (Kavanaugh, J.) (internal quotation marks omitted). And because "[t]here is no provision in the Constitution that authorizes the President to . . . repeal statutes," *Clinton v. City of New York*,

524 U.S. 417, 438 (1998), federal agencies have no discretion over whether to follow Congress's direction to spend appropriated funds.

Given that Congress appropriated funds for CIGP and DHS is "tak[ing] measures incompatible with the expressed or implied will of Congress," the executive branch's power "is at its lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). While the executive branch may have "policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program," it "does not have unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.); *see also City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) (same).

**3.** The CIGP dismantling is also "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). Agencies "are creatures of statute" and are therefore subject to the limits prescribed by Congress. *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022) (per curiam). Agencies "'literally ha[ve] no power to act' except to the extent Congress [has] authorized." *Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 912 (D.C. Cir. 2024) (first alteration in original) (quoting *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 301 (2022)). When an agency exceeds its statutory authorization, this Court must vacate and set aside that agency action. 5

48

U.S.C. § 706(2)(C). DHS points to nothing to suggest that it may entirely end a program for which Congress appropriated funding and which is central to Defendants' statutory mandate of citizenship and naturalization promotion. In the absence of statutory authorization for their actions, Defendants' dismantling of the CIGP is unlawful.

### 2. The Nonprofits are likely to succeed on their constitutional and ultra vires claims.

As explained above (at 32-34), if the Court decides that it cannot review the Nonprofits' claims under the APA—for example, if the Court concludes that terminating the CIGP is not a discrete agency action—the Court has inherent equitable jurisdiction separate from the APA to consider the Nonprofits' freestanding claims that DHS's termination of the CIGP violates the separation of powers and is ultra vires. *See Armstrong*, 575 U.S. at 327. And for the reasons just outlined, DHS has no power to unilaterally terminate the CIGP, a program for which Congress has continued to appropriate funds. That is yet another reason that the Nonprofits are likely to succeed on the merits.

### B.  The Nonprofits are suffering irreparable harm.

At oral argument the district court acknowledged that the Nonprofits "made [their] point on irreparable harm" and that "there's a pretty solid record on that point." JA672. That is because the Nonprofits have shown

that not only is irreparable harm "*likely* in the absence of an injunction," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), it is already happening. The CIGP termination is effectively forcing the closure of the Nonprofits' naturalization programs, causing the loss of core employees, subgrantees, and clients, and damaging their reputations. All of these harms rise to the level of irreparable. And none can "be fully rectified by the final judgment after trial." *Mt. Valley Pipeline, LLC v. 6.56 Acres,* 915 F.3d 197, 216 (4th Cir. 2019) (internal quotation marks and citation omitted).

**1.** Each of the harms the Nonprofits are suffering would alone be enough to grant preliminary relief. Combined, there can be no question.

*First*, agency action that "unquestionably make[s] it more difficult for [organizations] to accomplish their primary mission" constitutes irreparable harm. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). For the Nonprofits, naturalization programs are critical to carrying out their primary missions. *See, e.g.*, JA523. CIGP funds the majority—and sometimes all—of each Nonprofit's naturalization program, *see, e.g.*, JA534 (76%); JA505 (75%); JA542 (100%). For example, as a result of the CIGP termination, ESLC will soon be forced to terminate its entire citizenship program, JA535, so too for HIAS PA, JA549. This "major reduction, or outright elimination, of critical . . . services" constitutes irreparable harm.

*Nat'l Lifeline Ass'n v. FCC*, No. 18-1026, 2018 WL 4154794, at *1 (D.C. Cir. Aug. 10, 2018).

Irreparable harm does not require the total loss of a party's program or project—"undue delay" suffices. *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 828 (4th Cir. 2004). To the extent some Nonprofits can continue to provide reduced naturalization services to their clients without CIGP reimbursements, their efforts will be unduly delayed by the staff and program cuts caused by the CIGP termination. Without a full complement of English-language and civics classes, sufficient instructors for those classes, and enough attorneys to prepare clients to apply and interview for naturalization, the Nonprofits will be forced to fashion "wasteful and inefficient" offerings to continue offering *some* services. *See id.*

In addition, the CIGP termination has forced the Nonprofits to divert already-scarce resources, causing additional "unrecoverable financial harms." *See Mt. Valley Pipeline,* 915 F.3d at 219. Despite the near-total loss of funding for their naturalization programs, the Nonprofits are ethically obligated to continue providing some naturalization services because they have attorney-client relationships they must uphold. *See, e.g.*, JA577 (MIRA must cover 174 open naturalization cases); JA515 (CARECEN must cover 140 open cases). As a result, they have also been forced to do emergency fundraising, drawing staff away from their ordinary jobs and harming other

aspects of their operations. *See, e.g.*, JA506; JA562; JA578; JA536; JA522. The Nonprofits have been using unrestricted general funds that would normally support other programs to cover these ongoing costs. Even if CIGP is restored, the Nonprofits will never recover these already-spent general funds because CIGP reimbursements are restricted to specific activities, which do not include emergency fundraising or other stop-gap work.

*Second*, "the loss of customers and employees" also constitutes harm "that c[an] not be remedied" by a final judgment. *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022). As the impact of the CIGP elimination continues to compound since the termination announcement in late March, the Nonprofits have had to lay off staff members and stop accepting new naturalization clients. *See e.g.* JA514; JA528; JA552. The Nonprofits may never be able to rehire those specific employees, who will be looking for other jobs. And the ability to hire *new* staff down the road does nothing to remedy the irreparable loss of "valuable institutional knowledge." *Beacon Assocs. v. Apprio, Inc.*, 308 F.Supp.3d 277, 289 (D.D.C. 2018).

*Third,* the Nonprofits also face—and in some cases, are already suffering—a "loss of good will" due to the elimination of CIGP and its knock-on effects. *See Real Time Med. Sys. v. PointClickCare Techs.*, 131 F.4th 205, 239 (4th Cir. 2025). So even if the Nonprofits' programs could survive, they

are suffering a "significant and irreparable" injury because "the community connections they have developed are likely to erode." *See HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021).

Plaintiffs have spent years, and sometimes decades, building up reputations with underserved and hard-to-reach immigrant communities, prospective funders, and subgrantee organizations, reputations which they are rapidly losing. Without the ability to seek CIGP reimbursement for their work, Plaintiffs have terminated subgrantee relationships, *see, e.g.*, JA554; JA563-564, and lost their clients' trust because of cancelled services. *See, e.g.*, JA523; JA563; JA552; JA579-580. This harm is especially severe given that the communities the Nonprofits serve are hard-to-reach immigrant communities with limited English proficiency. *Cf. Woonasquatucket River Watershed Council v. USDA,* No. 1:25-cv-00097, 2025 WL 1116157, at *23 (D.R.I. Apr. 15, 2025) (finding irreparable reputational harm where funding freeze would result in loss of trust with Native American tribe by reinforcing history of broken promises between U.S. government and tribes).

But the Nonprofits' images are not just being tarnished among the populations they serve. The CIGP termination and its financial impacts on the Nonprofits have led funders to question the reliability of the Nonprofits' services and even the viability of their entire organizations. *See, e.g.*, JA516; JA565. So, for example, a donor declined to fund HIAS PA because of

concerns over the CIGP termination. JA552. And funders are "questioning what the ESLC 'did' to cause the loss of funding." JA537.

**2.** If the CIGP termination is enjoined only after a final judgment, that will not ameliorate these harms. After all, "when a temporary delay in recovery somehow translates to permanent injury . . . it [can] qualify as irreparable." *Mt. Valley Pipeline*, 915 F.3d at 218. That is the case here. Unlike the plaintiffs in *California*, 145 S.Ct. at 969, the Nonprofits do not have the financial ability to continue their naturalization programs during litigation. So if the Nonprofits ultimately prevail in this case, their victory would be pyrrhic absent preliminary relief. An order months (or more) down the road allowing them to continue their CIGP programs will mean little when they have already laid off the staff that run the programs, abandoned or turned away the clients that rely on them, cancelled subgrants, and, in some instances, shut down the programs entirely.[10]

---

[10] And FY2024 Nonprofits may lose the ability to get meaningful relief altogether if DHS reobligates FY2024 CIGP funding before a court orders preliminary relief preventing them from doing so. "In cases involving government expenditures, 'once the relevant funds have been obligated, a court cannot reach them in order to award relief.' Any transfer, re-allocation, or re-obligation of these funds would be an irreparable loss." *Climate United Fund v. Citibank N.A.*, No. 1:25-cv-00698, 2025 WL 842360, at *9 (D.D.C. Mar. 18, 2025) (quoting *City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1426–27 (D.C. Cir. 1994)).

DHS has insisted that these harms could be remedied by monetary relief at the end of the case. *See* Opp. Br. 25. Not so. As already explained (at 19-20), the Nonprofits do not seek monetary relief. So the most they could get is the right to seek reimbursement under CIGP. But because they cannot maintain their naturalization programs in the interim, a final judgment would give them the futile right to seek reimbursement for work they cannot perform. Put simply, preliminary relief is "necessary to prevent the irreparable injury of either forgoing a reimbursable program or mistakenly expending . . . funds that will not be reimbursed," *Bowen*, 487 U.S. at 926 (Scalia, J., dissenting).

### C. The public interest and balance of the equities tip decisively in the Nonprofits' favor.

When the government defends a lawsuit, determination of the public interest and balance of the equities merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). These combined factors overwhelmingly favor an injunction. The public has a substantial interest in "seeing its governmental institutions follow the law." *Roe v. Dep't of Defense*, 947 F.3d 207, 230-31 (4th Cir. 2020), *as amended* (Jan. 14, 2020). DHS itself describes the public's interest in overcoming the "real and perceived barriers to naturalization [that] often prevent individuals from pursuing naturalization": "naturalization is a key milestone in the civic integration of immigrants," and preparing to meet

naturalization requirements "encourage[s] civic learning," "build[s] a strong foundation upon which immigrants can fully integrate into American society," and allows immigrants to "gain tools to become successful and meet their responsibilities as United States citizens."[11]

Additionally, "a court should '[take] account of the equities in fashioning interim relief, focusing specifically on the concrete burdens that would fall' on the party seeking the injunction." *Roe*, 947 F.3d at 231. As explained above, without preliminary relief, the Nonprofits will continue to suffer immediate and irreparable harm, including loss of staff, shuttering of programs, and reputational harm. Their students will lose out on months or years of progress in their language and civics studies, and their clients' ability to naturalize—and the rights that come along with it, including voting—will be delayed.

On the other side of the scale, agencies like DHS do not suffer harm from "an injunction that merely ends an unlawful practice." *Open Cmtys. All. v. Carson*, 286 F.Supp.3d 148, 179 (D.D.C. 2017) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). Any "injury" to DHS from "being prevented from enacting its preferred policy" "is, to some extent, inevitable in the preliminary injunction context." *See New York v. DHS*, 969

---

[11] *Grant Program Impact*, U.S. Citizenship and Immigr. Servs., https://perma.cc/WZM4-EGLF.

F.3d 42, 87 (2d Cir. 2020). Such "inevitable" harm does not tip the scales here, especially when DHS has failed to provide anything other than vague or nonsensical justifications for its actions. *See, e.g.*, JA234 (terminating CIGP grants because of a wholly unexplained change in policy); JA229 (expressing concerns that programs like CIGP—that help lawful permanent residents become citizens—somehow encourage "illegal immigration").

## CONCLUSION

The judgment of the district court should be reversed and this Court should either enter a preliminary injunction or stay under Section 705 of the APA, or instruct the district court to do so.

Respectfully submitted,

/s/ *Bradley Girard*

Niyati Shah
Shalaka Phadnis
Asian Americans Advancing
  Justice—AAJC
1620 L St. NW, Suite 1050
Washington, DC 20036
(202) 296-2318

Jose Perez
Rex Chen
LatinoJustice PRLDEF
475 Riverside Dr., Suite 1901
New York, NY 10115
(212) 219-3360

Bradley Girard
Sarah M. Rich
Adnan Perwez
Robin F. Thurston
Democracy Forward Foundation
P.O. Box 34556
Washington, D.C. 20043
(202) 448-9090

Nickole Durbin-Felix
LatinoJustice PRLDEF
4700 Millenia Blvd., Suite 500
Orlando, FL 32839
(321) 247-6657

*Counsel for Appellants*

June 25, 2025

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 12,828 words including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word 365, set in Century Schoolbook font in a size measuring 14 points or larger.

*/s/ Bradley Girard*

**CERTIFICATE OF SERVICE**

I certify that on June 25, 2025 this corrected brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

/s/ *Bradley Girard*