No. 25-1640

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

———————————————

Solutions in Hometown Connections *et al.*,

*Plaintiffs-Appellants*,

v.

Kristi Noem *et al.*,

*Defendants-Appellees.*

———————————————

On appeal from a denial of a preliminary injunction from the
United States District Court for the District of Maryland
Case No. 25-cv-885, Hon. Lydia K. Griggsby

———————————————

**Reply Brief for Appellants**

———————————————

Niyati Shah
Shalaka Phadnis
Asian Americans Advancing
    Justice—AAJC
1620 L St. NW, Suite 1050
Washington, DC 20036
(202) 296-2318

Jose Perez
Rex Chen
LatinoJustice PRLDEF
475 Riverside Dr., Suite 1901
New York, NY 10115
(212) 219-3360

Bradley Girard
Sarah M. Rich
Adnan Perwez
Robin F. Thurston
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

Nickole Durbin-Felix
LatinoJustice PRLDEF
4700 Millenia Blvd., Suite 500
Orlando, FL 32839
(321) 247-6657

*Counsel for Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... ii

INTRODUCTION ...................................................................................... 1

ARGUMENT .............................................................................................. 2

I.    The district court has jurisdiction over the APA claims. ..................... 2

    A.    The Nonprofits brought APA claims for prospective equitable relief, not breach-of-contract claims for money damages. ...................................................................... 2

        1.    The Nonprofits do not seek money damages under any contracts. ................................................................. 2

        2.    The Nonprofits' claims are not disguised breach-of-contract claims. .............................................................. 4

        3.    The Court of Federal Claims cannot provide the Nonprofits an adequate remedy. ....................................... 11

    B.    DHS does not have discretion to eliminate CIGP while Congress is funding it. ................................................... 12

    C.    The Nonprofits challenge discrete, reviewable agency action. .................................................................... 13

II.   The district court has jurisdiction over the Nonprofits' separation-of-powers and ultra vires claims ................................ 16

III.  The Nonprofits should be granted preliminary relief. ...................... 20

    A.    DHS is wrong on the merits. ......................................... 20

    B.    DHS does not address the remaining factors for preliminary relief. ....................................................... 26

CONCLUSION ....................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*AIDS Vaccine Advoc. Coal. v. Dep't of State,*
    770 F. Sup. 3d 121 (D.D.C. 2025)........................................................ 15

*Armstrong v. Exceptional Child Ctr.,*
    575 U.S. 320 (2015)............................................................................ 17

*Ass'n for Educ. Fin. & Policy, Inc. v. McMahon,*
    2025 WL 1568301 (D.D.C. June 3, 2025)........................................... 16

*Boaz Housing Auth. v. United States,*
    994 F.3d 1359 (Fed. Cir. 2021).......................................................... 22

*Bostock v. Clayton Cnty., Georgia,*
    590 U.S. 644 (2020)............................................................................ 25

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988)........................................................ 3, 7, 10, 11

*California v. Dep't of Educ.,*
    25-cv-10548 (D. Mass.) ...................................................................... 9

*Chamber of Com. of U.S. v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996)........................................................... 18

*City of New York v. Dep't of Defense,*
    913 F.3d 423 (4th Cir. 2019) ........................................................... 14

*Cmty. Action Programs Exec. Directors Ass'n of N.J., Inc. v. Ash,*
    365 F.Supp. 1355 (D.N.J. 1973) ....................................................... 21

*Columbus Reg'l Hosp. v. United States,*
    990 F.3d 1330 (Fed. Cir. 2021)........................................................... 4

*Dalton v. Specter,*
    511 U.S. 462 (1994)...................................................................... 17, 18

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019).......................................................................... 12

## TABLE OF AUTHORITIES—continued

**Page(s)**

*Dep't of Educ. v. California,*
  145 S.Ct. 966 (2025)................................................................ 8, 9

*DHS v. Regents of the Univ. of Cal.,*
  591 U.S. 1 (2020).................................................................... 23

*Eden, LLC v. Justice,*
  36 F.4th 166 (4th Cir. 2023) ................................................. 16

*Fed. Election Comm'n v. Wisconsin Right To Life, Inc.,*
  551 U.S. 449 (2007)............................................................... 16

*Food & Drug Admin. v. R. J. Reynolds Vapor Co.,*
  145 S.Ct. 1984 (2025)............................................................. 6

*In re Aiken Cnty.,*
  725 F.3d 255 (D.C. Cir. 2013).............................................. 21

*Ingersoll-Rand Co. v. United States,*
  780 F.2d 74 (D.C. Cir. 1985)................................................ 11

*LeBlanc v. United States,*
  50 F.3d 1025, 1028 (Fed. Cir. 1995)................................... 20

*Leedom v. Kyne,*
  358 U.S. 184 (1958)............................................................... 19

*Lincoln v. Vigil,*
  508 U.S. 182, 192-94 (1993) ............................................... 13

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990)............................................................... 15

*Lummi Tribe of the Lummi Rsrv. v. United States,*
  870 F.3d 1313 (Fed. Cir. 2017).................................... 7, 8, 11

*Maine Cmty. Health Options v. United States,*
  590 U.S. 296 (2020)....................................... 2, 3, 7, 10

*Mannat v. United States,*
  48 Fed. Cl. 148 (2000)......................................................... 20

## TABLE OF AUTHORITIES—continued

**Page(s)**

*Megapulse, Inc. v. Lewis,*
 672 F.2d 959 (D.C. Cir. 1982) ............................................................. 4

*Milk Train v. Veneman,*
 310 F.3d 747 (D.C. Cir. 2002) ........................................................... 13

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.,*
 26 F.4th 960 (D.C. Cir. 2022) ........................................................... 19

*Nat'l Council of Cmty. Mental Health Ctrs., Inc. v. Weinberger,*
 361 F.Supp. 897 (D.D.C. 1973) ......................................................... 21

*Norton v. S. Utah Wilderness All.,*
 542 U.S. 55 (2004) ............................................................................. 14

*Nuclear Regulatory Commission v. Texas,*
 145 S.Ct. 1762 (2025) ....................................................................... 19

*Steves & Sons, Inc. v. JELD-WEN, Inc.,*
 988 F.3d 690 (4th Cir. 2021) ............................................................. 22

*Strickland v. United States,*
 32 F.4th 311 (4th Cir. 2022) ............................................................. 19

*Sustainability Inst. v. Trump,*
 No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025) .............. 8, 17

*Tootle v. Sec'y of Navy,*
 446 F.3d 167 (D.C. Cir. 2006) ........................................................... 20

*United States v. King,*
 395 U.S. 1 (1969) ................................................................................. 2

*Yee v. City of Escondido, Cal.,*
 503 U.S. 519 (1992) ............................................................................. 4

**Statutes and Regulations**

5 U.S.C. § 551 ......................................................................................... 14

5 U.S.C. § 701 ......................................................................................... 12

**TABLE OF AUTHORITIES—continued**

**Page(s)**

6 U.S.C. § 111 ..................................................................... 24, 25

6 U.S.C. § 271 ..................................................................... 24, 26

28 U.S.C. § 1491 ................................................................ 11

Pub. L. No. 106-78, 113 Stat. 1135 (1999)......................... 13

Pub. L. No. 112-74, 125 Stat. 786 (2012)........................... 24

Pub. L. No. 116-6, 133 Stat. 13 (2019)............................... 24

2 C.F.R. 200.340 ................................................................ 23

**Other Authorities**

U.S. Citizenship and Immigr. Servs., Privacy Impact Assessment
      for the Citizenship and Integration Grant Program (May 19,
      2017), https://perma.cc/B7R4-QBNH .................................. 26

## INTRODUCTION

DHS's central argument is that the Nonprofits' claims for injunctive relief are just dressed-up contract claims for monetary relief, so the Tucker Act requires that the claims be brought in the Court of Federal Claims. But buried in a footnote, DHS gives away the game. DHS concedes (at 18 n.8) that the claims of two Nonprofits—those with FY24 grants—are not (and *cannot* be) Tucker Act claims for monetary relief because the grant agreements expressly disclaim Tucker Act jurisdiction. DHS argues instead that the district court lacks authority to resolve those claims because they "seek broad injunctive relief" not cognizable under the APA. DHS Br. 18-19 n.8, 41. But all ten Nonprofit-Plaintiffs bring the exact same claims. So if the FY24 Nonprofits' claims are not Tucker Act contract claims—and they're not—neither are the identical claims of all the other Nonprofits.

That concession aside, DHS misstates the Nonprofits' claims and requested relief to insist that this case must be brought in the Court of Federal Claims, which has no jurisdiction to hear the Nonprofits' claims and no ability to grant them any relief. DHS then tries to reduce the APA's presumption of review of agency action to a nullity. And it argues that it doesn't matter if *no* court can consider the Nonprofits' separation-of-powers and ultra vires claims. DHS is wrong at every step. Preliminary relief here is both appropriate and necessary.

1

## ARGUMENT

**I. The district court has jurisdiction over the APA claims.**

### A. The Nonprofits brought APA claims for prospective equitable relief, not breach-of-contract claims for money damages.

The crux of DHS's argument is that because the Nonprofits' grants are agreements with the government that involve disbursements of money, any claims concerning those grants are Tucker Act contract claims. But DHS conflates monetary relief with money damages and assumes that every agreement with the government is an enforceable contract for damages.

#### *1. The Nonprofits do not seek money damages under any contracts.*

**a.** DHS argues that "[p]arties that seek to access funds that the government is purportedly obligated to pay under contracts or grants must typically proceed under the Tucker Act." DHS Br. 19 (footnote omitted). But the Court of Federal Claims' Tucker Act jurisdiction does not extend to every case in which "funds" are sought from the government; it is "limited to actual, presently due *money damages* from the United States." *United States v. King*, 395 U.S. 1, 3 (1969) (emphasis added). Money damages are specific sums of money that compensate for harms already suffered, including past-due payments. Opening Br. 19 (citing *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 326-27 (2020)).

As DHS admits, *no* past-due sums are at issue here. *See* DHS Br. 10; Opening Br. 20. So there are no money damages, Opening Br. 20, and the Court of Federal Claims lacks jurisdiction over the Nonprofits' claims. *Id.* at 29. DHS simply ignores this argument. The Court can (and should) stop its Tucker Act analysis there.

**b.** Even if *some* money damages were at issue, the district court would still have jurisdiction to adjudicate the Nonprofits' APA claims. As the Supreme Court has twice held, the district court's authority under the APA "to award complete relief" is "not barred by the possibility that a purely monetary judgment may be entered" by the Court of Federal Claims. Opening Br. 22 (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988), and citing *Maine Cmty. Health Options*, 590 U.S. at 326-27). DHS ignores this line of authority as well.

**c.** As the Nonprofits explained (at 22-24), DHS's insistence that the claims here are contract claims resolvable only by the Court of Federal Claims assumes that CIGP grants are contracts and that every claim against the government based on a contract must proceed in the Court of Federal Claims.[1]

_____

[1] DHS argues (at 30) that the Nonprofits forfeited any argument that the grants are not enforceable contracts. That's incorrect. The bulk of the litigation in the district court addressed whether claims about CIGP grants are APA claims or contract claims. And a party on appeal "can make any

The Nonprofits do not contend—as DHS insists (at 30)—that *no* grants could ever be enforceable contracts. But as the very cases DHS relies on confirm, the Court of Federal Claims has jurisdiction over grants only "when the standard conditions for a contract are satisfied." DHS Br. 31 (citing *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021)). DHS's only explanation for why those standard conditions are satisfied here is two passing sentences and a bulk cite to hundreds of pages in the joint appendix. DHS Br. 31.

### 2. The Nonprofits' claims are not disguised breach-of-contract claims.

Even if CIGP grants are contracts for which a claim for money damages could be brought, that does not mean that any claim brought by CIGP grantees is a Tucker Act claim. Under *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982), a claim against the government belongs in the Court of Federal Claims only when (1) the source of the plaintiff's asserted legal right is contractual *and* (2) the appropriate relief is money damages. Opening Br. 26. DHS misapplies both steps.

**a.** The Nonprofits' opening brief explained that whether the source of a legal right is contractual does not turn on the existence of a contract or other

---

argument in support of" claims properly presented to the district court; "parties are not limited to the precise arguments they made below." *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 534-35 (1992).

agreement with the government. Opening Br. 26. Instead, it turns on whether the Court must apply constitutional provisions, statutes, and regulations, on one hand, or apply contract law to the terms of an agreement on the other. *Id.* DHS argues that the Nonprofits' claims turn on an interpretation of the grants because the grants are the source of the Nonprofits' rights and the monetary relief that the Nonprofits seek. DHS Br. 23-24. That is wrong for three reasons.

First, DHS concedes that the FY24 Nonprofits do not bring contract claims under the Tucker Act. DHS Br. 18 n.8. But all the Nonprofits bring the exact same claims, requiring the exact same analysis. None of the Nonprofits allege that DHS violated any terms of the CIGP grants. So the Court does not need to look at the terms of the grant agreements to decide the case. Opening Br. 27. And DHS does not point to any relevant CIGP grant terms that the court must apply. So it simply cannot be the case that for the FY23 Nonprofits, the legal source of the rights and the required analysis is contractual but for the FY24 Nonprofits it is not.

Second, DHS insists that the grants must be the source of the Nonprofits' rights because the appropriations acts "confer[] no rights" on the Nonprofits and the Homeland Security Act doesn't mention CIGP by name. DHS Br. 26. That's just not right. As explained below (at 20-21, 24-26), and in our opening brief (at 44-45, 47), the appropriations acts and the

5

Homeland Security Act prohibit DHS from eliminating CIGP. So CIGP grantees' "interests are [not] so marginally related to or inconsistent with the purposes implicit in the statute[s]," *Food & Drug Admin. v. R. J. Reynolds Vapor Co.*, 145 S.Ct. 1984, 1991 (2025) (citation omitted), that they cannot be the basis for APA claims. And DHS does not argue that the Nonprofits' other sources of rights—the APA, the Constitution, and the Uniform Guidance—cannot be the basis for their claims.

Third, DHS argues that none of the sources of law underlying the Nonprofits' APA claims give the Nonprofits "any right to money." DHS Br. 25-26. But that's *our* point: The Nonprofits seek only prospective equitable relief. *See* Opening Br. 27-30. DHS's response mischaracterizes the requested relief and misapprehends what money damages are.

To begin with, DHS selectively quotes (at 24) the Nonprofits' proposed PI order, allowing it to obscure the principal relief the Nonprofits seek: an injunction stopping DHS from wholesale termination of CIGP. *See* DHS Br. 26 n.15. Instead, DHS repeatedly casts the Nonprofits' requested prospective injunctive relief as a request for money damages—"the payment of money owed under their contracts," DHS Br. 26, or "sums due," DHS Br. 20. But as already explained (at 3), DHS acknowledges that no past-due sums are at issue. So that argument is just wrong.

Next, DHS conflates a judgment for money damages and an order that results in restored grantor-grantee relationships that *may* later result in disbursement of grant funds. But money damages are retrospective: an award of specific sums for harms already suffered. *See* Opening Br. 19. So an order for money damages is an enforceable judgment for a set amount of money, free and clear of any restrictions. *See Lummi Tribe of the Lummi Rsrv. v. United States*, 870 F.3d 1313, 1318-19 (Fed. Cir. 2017). The Court of Federal Claims can order that relief. *Id.*

The *potential* for future monetary relief resulting from an injunction, on the other hand, is not a money-damages award. *See* Opening Br. 28 (citing *Bowen*, 487 U.S. at 893; *Maine Cmty. Health Options*, 590 U.S. at 327; *Lummi*, 870 F.3d at 1318-19). DHS all but ignores these key precedents. DHS does not even acknowledge *Lummi*. It cites *Maine Community Health Options* once for a mine-run statement about sovereign immunity, but ignores the rest of it. DHS Br. 18. And as to *Bowen*, DHS pretends that the Court's extensive discussion of money damages—which explains that just because "a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages,'" 487 U.S. at 893—does not exist. DHS Br. 27.

The reason that potential monetary relief is not money damages is that the former is conditioned on the occurrence of future events, such as future

work performed on a grant. *Lummi*, 870 F.3d at 1319. Put simply, a claim for "larger strings-attached" grants seeks equitable relief not money damages. *Id.* The Court of Federal Claims *cannot* order that relief. *Id.*; *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, No. 25-1611, 2025 WL 2017106, at \*7 (1st Cir. July 18, 2025).

Here, any grant funds that the Nonprofits could receive as a result of a judgment would be conditioned on future events. *See* Opening Br. 19. Namely, the Nonprofits completing approved grant work in the future and then later seeking reimbursement for that work. Neither the exact amount of that reimbursement nor the Nonprofits' entitlement to it will be certain until the Nonprofits complete the work and DHS adjusts the reimbursement amounts under the CIGP terms. So any funds that the Nonprofits could receive in the future are not presently due "money damages" that can be awarded by the Court of Federal Claims. *See Lummi*, 870 F.3d at 1319.

**b.** Instead of addressing that well-settled law, DHS employs the stay orders in *Department of Education v. California*, 145 S.Ct. 966 (2025) and *Sustainability Institute v. Trump*, No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025), to try to transform the Nonprofits' forward-looking injunctive claims into money-damages breach-of-contract claims. Neither case can bear the weight DHS assigns it.

8

*California* is a far cry from this case. For starters, the grantees there did not allege that the termination of their grants violated the Constitution or any statute besides the APA. Mem. ISO Mot. for TRO at 16-23, *California v. Dep't of Educ.*, 25-cv-10548 (D. Mass. Mar. 6, 2025), ECF No. 7. Instead, they alleged that their entitlement to funds arose solely from grants awarded in the agency's discretion following a competitive process. And they relied exclusively on the terms of the grants; that is, they contended only that the "terms and conditions of [their] grant awards d[id] not permit termination on the grounds" that the government invoked. *Id*. Second*,* the grantees sought payment of past-due obligations—classic retrospective relief—and continued payments as they accrued. *California*, 145 S.Ct. at 968. The Supreme Court concluded that the plaintiffs sought to "enforce a contractual obligation," notwithstanding their invocation of the APA. *Id.* (citation omitted).

Here, however, the Nonprofits do not seek to "enforce a contractual obligation," *id.* They brought APA claims of the kind not raised in *California*—including that DHS engaged in unreasoned decision-making in terminating the entire CIGP, relied on inapplicable provisions of the Uniform Guidance in the mass-termination notices, and violated the separation of powers. These claims do not require the district court to interpret grant terms; rather, they ask for a ruling clarifying DHS's future

9

obligations and the Nonprofits' future rights. As explained in *Bowen*, 487 U.S. at 904 n. 39 (1988), and *Maine Community Health Options*, 590 U.S. at 327, that is a heartland APA claim.

DHS is incorrect that *California* and this Court in *Sustainability Institute* rejected *Bowen*'s relevance here. DHS Br. at 27. In *California*, the Supreme Court expressly recognized that, under *Bowen*, a "district court's jurisdiction is not barred by the possibility that an order setting aside an agency's action may result in the disbursement of funds." 145 S.Ct. at 968 (citing *Bowen*, 487 U.S. at 910). Instead, the Court relied on the past-due sums that were part of a "contractual obligation." *Id.* Likewise, *Sustainability Institute* reasoned that the order on appeal fell under *California* because it "enforce[d] a contractual obligation to pay money." 2025 WL 1587100, at *2 (quoting *California*, 145 S.Ct. at 968). But as we've already shown (at 3), no past-due sums or contractual obligations to pay money are at issue here. Instead, relief here would give the Nonprofits the opportunity to carry out their grant work going forward and to seek reimbursement in the future. The "possibility" that the future relationship between the Nonprofits and DHS "may result in the disbursement of funds," *California,* 145 S.Ct. at 968, is no barrier to district-court jurisdiction.

### 3. *The Court of Federal Claims cannot provide the Nonprofits an adequate remedy.*

The Court of Federal Claims cannot provide the Nonprofits any relief at all. It cannot provide the Nonprofits equitable relief. *See* 28 U.S.C. § 1491(a)(2); *see also Bowen*, 487 U.S. at 905 n.40. There are no money damages at issue. *See supra* 3. And the Court of Federal Claims cannot grant relief in the form of strings-attached, prospective funds. *Lummi*, 870 F.3d at 1318-19. No relief at all surely is not an adequate remedy.

DHS dodges this point by arguing that the Nonprofits "can seek any contract damages they may have in the Court of Federal Claims." DHS Br. 28. But again, the Nonprofits have no "contract damages," and thus nothing to seek in the Court of Federal Claims—a crucial point DHS fails to reckon with. This is not a matter of getting one form of relief in lieu of another; this is a matter of whether the Nonprofits can get *any* relief. Dodging again, DHS argues that the Nonprofits really seek specific performance, which Congress precluded in contract claims against the government. DHS Br. 28-29 (quoting *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 80 (D.C. Cir. 1985)). *Ingersoll-Rand* held only that district courts do not have jurisdiction over breach-of-contract claims for money damages just because a "plaintiff cannot receive all its requested remedies," including specific performance. 780 F.2d at 80. It did not hold that any claim implicating the existence of

11

an agreement with the government—even one that does not involve money damages—must go to the Court of Federal Claims. And it certainly did not hold that no relief at all is an adequate remedy.

### B. DHS does not have discretion to eliminate CIGP while Congress is funding it.

DHS tries to evade APA review—even for the FY24 Nonprofits' claims, for whom the Tucker Act is irrelevant—by arguing that its decisions to freeze and ultimately refuse to spend appropriated CIGP funds are unreviewable because they are "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2). DHS Br. 43-45.

Courts apply a "presumption of judicial review" to APA claims and construe the Section 701(a)(2) exception "quite narrowly." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (citation omitted). Such "rare circumstances" occur only where "a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* But the Constitution, the Uniform Guidance, the Homeland Security Act, and the appropriations acts, among others, provide meaningful standards by which to review DHS's wholesale elimination of CIGP. That's the point of this case. Further, the exception generally is limited "to certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion, such as a decision not to institute

12

enforcement proceedings." *Id.* (quotations and internal citations omitted). The obligation to spend congressionally appropriated funds is not in those categories. *See* Opening Br. 44-45, 47-48.

DHS's cases do not say anything to the contrary. *Lincoln v. Vigil* extends only to funding decisions from lump-sum appropriations that do not mention the program at issue. 508 U.S. 182, 192-94 (1993). Here, Congress specifically appropriated money "for the [CIGP]" for FY23 and FY24—CIGP funding did not come out of a lump sum for USCIS. And in *Milk Train v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002), the appropriation was explicitly discretionary, directing that the funds "be disbursed 'in a manner determined appropriate by the Secretary.'" *Id.* at 749 (quoting Pub. L. No. 106-78, § 805, 113 Stat. 1135, 1179 (1999)). No similar discretionary language exists here. Further, *Milk Train* addresses an agency's discretion to "disburse" or award funding, which is far afield from ending an entire program—involving already-awarded funds—via mass terminations.

## C. The Nonprofits challenge discrete, reviewable agency action.

DHS also tries to avoid APA review by arguing that the steps it took to end CIGP were not "agency action." But DHS refuses to engage with either the APA's text or relevant caselaw, opting instead to spin a request for

regular status reports into a back-door attempt to run the agency's day-to-day operations.

DHS's cursory mention of the statutory definition of "agency action" under 5 U.S.C. § 551(13) provides no substantive response to the Nonprofits' detailed explanation in their opening brief (at 39-40) of how the definition applies to DHS's actions here. DHS Br. 40. Nor can it: Each of the steps DHS took to terminate CIGP—the Noem Memo, the freeze letters, and the mass termination of grants—constitutes either an "order" or "denial of relief," and thus they are by definition "circumscribed, discrete agency actions" subject to judicial review. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004); *see also* Opening Br. 40.

Instead, DHS repeats the generic distinction between "specific and discrete governmental conduct" and "a 'broad programmatic attack on the government's operations," but fails to explain why this case falls on the wrong side of that line. *See* DHS Br. 40 (quoting *City of New York v. Dep't of Defense*, 913 F.3d 423, 431 (4th Cir. 2019)). DHS's primary case defines "programmatic" challenges as "generalized grievances asking [a court] to improve an agency's performance or operations." *City of New York*, 913 F.3d at 431. There, the plaintiffs wanted the Defense Department to work faster to meet a statutory mandate the agency was already working toward, albeit too slowly. *Id.* at 433. But the Nonprofits do not seek an order telling DHS

14

to run the agency better. DHS is not running CIGP *poorly*—it is refusing to operate CIGP *at all*, despite Congress appropriating money for it.

Further, that DHS took a discrete action that affected all CIGP funding recipients at once does not render the Nonprofits' challenge "programmatic." An agency decision "applying some particular measure across the board"—like DHS's across-the-board funding freeze and subsequent en masse termination of all CIGP funding via identical form letters—can "of course be challenged under the APA." *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2 (1990).

DHS spends a significant portion of its argument focused narrowly on the Nonprofits' request for regular status reports from the government. DHS Br. 40-42. A request for regular status reports on whether CIGP is again operational cannot, however, convert a challenge to discrete agency action into a programmatic challenge, and it does not place the district court in control of agency decisions. Simply confirming that DHS is complying with a court order would *avoid*, not mandate, additional judicial intervention. None of DHS's cases say otherwise.[2]

---

[2] *City of New York* was a programmatic challenge because of what the plaintiffs alleged, not because they requested status reports. *See* 913 F.3d at 433-34. The relief requested in *AIDS Vaccine Advocacy Coalition* was significantly more detailed than what the Nonprofits request. *AIDS Vaccine Advoc. Coal. v. Dep't of State*, 770 F. Sup. 3d 121, 140-43 (D.D.C. 2025), *appeal filed*, Case Nos. 25-5097, 25-5098 (D.C. Cir.). And the plaintiffs in

Finally, DHS argues that review of the Noem Memo or the freeze letters would be moot given the "supervening" termination letters. DHS Br. 42-43. According to DHS, the funding freeze announced by the Noem Memo and implemented by the freeze letters is "'a hypothetical state of facts' that no longer exists." *Id.* at 43 (quoting *Eden, LLC v. Justice*, 36 F.4th 166, 170 (4th Cir. 2023)). But relief addressing the mass termination alone could return the Nonprofits to the indefinite funding freeze they initially sued to end. *See* JA727 n.1. And even if it did not, the funding freeze is capable of repetition yet evading review, excepting it from mootness—DHS moved on to terminations before the freeze could be fully litigated and is defending the decision to eliminate CIGP, so certainly has not disclaimed the freeze. *See Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 462 (2007) (citations omitted).

## II. The district court has jurisdiction over the Nonprofits' separation-of-powers and ultra vires claims.

District courts have jurisdiction to hear separation-of-powers and ultra vires claims under long-settled precedent. Opening Br. 32-34. And because neither separation-of-powers nor ultra vires claims are money-mandating,

---

*Association for Education Finance & Policy*, did not even request status reports. *Ass'n for Educ. Fin. & Policy, Inc. v. McMahon*, 2025 WL 1568301, at *7 (D.D.C. June 3, 2025).

they cannot be brought in the Court of Federal Claims. Opening Br. 33-34. DHS nowhere argues otherwise.

Instead, DHS points to the stay order in *Sustainability Institute*, which said that "it appears unlikely" that separation-of-powers and ultra vires claims "would provide a detour around the Tucker Act," 2025 WL 1587100, at *2, blithely concluding that "[t]he same logic forecloses" the Nonprofits' separation-of-powers and ultra vires claims. DHS Br. 32. But as we explained in our opening brief (at 37), that reasoning is wrong. DHS does not address our argument or even attempt to defend the order's reasoning. Instead, DHS relies on two Supreme Court cases to explain why the Nonprofits' separation-of-powers and ultra vires claims fail. DHS is wrong on both.

**A.** Separation-of-powers claims are not subject to the APA's limits on the waiver of sovereign immunity because they are "the creation of courts of equity, and reflect[] a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 327 (2015). DHS argues that the Nonprofits' separation-of-powers claims are foreclosed by *Dalton v. Specter*, 511 U.S. 462 (1994), because claims alleging that the President exceeds his statutory authority are statutory—not constitutional—claims. DHS Br. 34. But in *Dalton*, a statute gave the President discretion to decide which military bases to shut down,

17

and the plaintiffs claimed that the President violated the separation of powers when he did not follow the statutory procedures. 511 U.S. at 469. The Court held that challenges to how a President exercises the discretion given to him by statute are not constitutional claims, but the Court affirmed that claims that the executive acts without any authority *are* constitutional claims. *Id.* at 473-74. Put another way, *Dalton* "merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996).

The Nonprofits do not argue that DHS abused any statutory discretion. They argue that because Congress alone controls the federal purse strings, the Executive Branch lacks any authority to unilaterally decide to refuse to spend congressionally appropriated funds en masse, as it has done here. Opening Br. 47-48. The Nonprofits cited post-*Dalton* cases that straightforwardly say as much. *See* Opening Br. 47-48. DHS simply ignores each one of those cases. And the Impoundment Control Act and Antideficiency Act, also ignored entirely by DHS, reinforce this clear lack of discretion under the statute. *See* Opening Br. 44-45. Should the President wish to decline to spend congressionally authorized funds, Congress has provided the mechanism to do so.

**B.** Likewise, sovereign immunity does not apply to ultra vires claims alleging that federal officials "exceeded the scope of their authority." *Strickland v. United States*, 32 F.4th 311, 363 (4th Cir. 2022). DHS argues that the Nonprofits' ultra vires claims are foreclosed by *Nuclear Regulatory Commission v. Texas*, 145 S.Ct. 1762 (2025). Not so.

*NRC* reiterated the Court's holding in *Leedom v. Kyne*, 358 U.S. 184 (1958), that an ultra vires claim must satisfy two requirements: First, the agency's action must have been "in excess of its delegated powers and contrary to a specific prohibition in a statute." *NRC*, 145 S.Ct. at 1776. Second, there must be no alternative "meaningful and adequate" opportunity for judicial review. *Id.* If an agency has violated a plain statutory limit on its authority and Congress has not explicitly precluded or provided an alternative path for judicial review, an ultra vires action is appropriate. *See Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 971 (D.C. Cir. 2022). The Nonprofits meet this standard.

As explained in our opening brief (at 44-45, 47) and discussed below (at 20-21, 24-26), the appropriations acts and the Homeland Security Act prohibit DHS from eliminating CIGP altogether. But that is precisely what DHS did. Absent district-court jurisdiction, the Nonprofits do not have a "meaningful and adequate opportunity for judicial review" of that decision. *See NRC*, 145 S.Ct. at 1776. DHS insists that the Nonprofits must bring

their claims in the Court of Federal Claims. But here too DHS ignores that review in the Court of Federal Claims is limited to money-damages claims. And the Nonprofits' ultra vires claims are equitable claims that eschew money damages—so the Court of Federal Claims could not hear them. *See* Opening Br. 33-34 (citing *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995) and *Mannat v. United States*, 48 Fed. Cl. 148, 154 (2000)). That would leave the Nonprofits with *no* court to review DHS's statutory violations. As much as DHS might prefer that result, this Court should reject it. Opening Br. 37 (citing *Tootle v. Sec'y of Navy*, 446 F.3d 167, 169 (D.C. Cir. 2006)).

## III. The Nonprofits should be granted preliminary relief.

### A. DHS is wrong on the merits.

As we've already shown, DHS has forfeited any argument on the merits that termination of the entire CIGP was not arbitrary and capricious. Opening Br. 43. That is enough to decide for the Nonprofits. In all events, DHS's efforts to justify the CIGP termination under the appropriations acts, the Uniform Guidance, and the Homeland Security Act all fail.

*Appropriations Acts*: Without citing any authority—or acknowledging the authority cited in the Nonprofits' opening brief, including the Impoundment Control Act and Antideficiency Act—DHS states that because the appropriations acts "contain no statutory mandate requiring

USCIS to act in any specific manner," DHS is free to spend, or not spend, the appropriated funds as it wishes. DHS Br. 36. That's simply wrong. Although DHS may have "policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program," it "does not have unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.).[3]

*Uniform Guidance*: DHS seeks to evade its violations of the Uniform Guidance's limits on grant termination addressed in our opening brief (at 45-46) in two ways. The first argument is wrong, and the second is irrelevant.

First, DHS argues that when a contractual provision incorporates governing regulations, those regulations become "contractual in nature." DHS Br. 38 (quoting *Boaz Housing Auth. v. United States*, 994 F.3d 1359,

---

[3] *See also Cmty. Action Programs Exec. Directors Ass'n of N.J., Inc. v. Ash*, 365 F.Supp. 1355, 1361 (D.N.J. 1973) ("[O]nce Congress has appropriated funds for a specific program, the Executive Branch has a duty to spend them. It has no authority under the Constitution to refuse to spend those funds, and performs only a ministerial function."); *Nat'l Council of Cmty. Mental Health Ctrs., Inc. v. Weinberger*, 361 F.Supp. 897, 902 (D.D.C. 1973) (holding that appropriation of funds "available for obligation and expenditure until the end of such fiscal year" made "the spending of [those] funds" "mandatory"), *supplemented*, 387 F.Supp. 991 (D.D.C. 1974) (awarding attorney's fees), *rev'd sub nom. Nat'l Council of Cmty. Mental Health Ctrs., Inc. v. Mathews*, 546 F.2d 1003 (D.C. Cir. 1976) (reversing attorney's fees award).

1367 (Fed. Cir. 2021)). But in *Boaz*, the plaintiffs brought breach-of-contract claims, and the government argued that because the contract incorporated regulations that were not money-mandating, the Court of Federal Claims did not have jurisdiction. *Boaz*, 994 F.3d at 1363. The court rejected the government's attempt to reframe the plaintiffs' claims, *id.*, as it should here. Plaintiffs are the masters of their complaints, *see, e.g.*, *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 728 (4th Cir. 2021), so they, not defendants, decide what claims to pursue.

What's more, *Boaz* does not stand for the proposition that incorporation of any source of law into a contract means that any claims arising under that source of law necessarily become contract claims. Were that the case, the government could "incorporate" the Due Process Clause or the First Amendment as terms of every contract and avoid district court review of claims based on those constitutional provisions.

Second, DHS's effort to seek shelter in certain provisions of the grant awards—chiefly those incorporating the Uniform Guidance and the so-called "termination" provision—is both irrelevant to the Nonprofits' claims and not what the agency relied on in its mass-termination email or boilerplate letters. DHS Br. 38.

DHS mentions in passing that, under the Uniform Guidance, it "may terminate grants for various reasons—*e.g.*, a change in policy priorities,"

22

DHS Br. 39, but completely ignores the Nonprofits' arguments that the Uniform Guidance does *not* allow termination of grants when DHS changes priorities. *See* Opening Br. 45-46. Instead of responding to the Nonprofits' argument, DHS asserts (at 39) that it followed *additional* procedural prerequisites for grant termination under the Uniform Guidance. That's a non sequitur. Whether or not DHS did some things right, doesn't mean DHS gets to violate other mandatory termination obligations of the Uniform Guidance.

DHS also argues that it followed the termination provisions of each grant, which required nothing more than 30-days' notice. DHS Br. 38-39. So what? The Nonprofits do not allege that DHS failed to follow the terms of the grants. And the Uniform Guidance explicitly supersedes the grant terms. *See* JA279. So following the grant's termination provisions does not cause DHS's Uniform Guidance violations to disappear.

Even assuming that the grants' termination provisions mattered, they do not help DHS here. "An agency must defend its actions based on the reasons it gave when it acted." *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020). And DHS informed all grantees that it was terminating the grants, not under any termination provisions, but because of a change in priorities under 2 C.F.R. § 200.340(a)(2). JA231-32. So DHS cannot now rely on the grants' 30-day termination provision (which, in any case, applies

only to FY23 grantees, *see* DHS Br. 7). It must justify the terminations under the Uniform Guidance, which, as we've already shown, it cannot. *See* Opening Br. 45-46.

*Homeland Security Act*: The Homeland Security Act requires DHS to accomplish a number of functions, including some "not related directly to securing the homeland" like promoting citizenship instruction and training. 6 U.S.C. §§ 111(b)(1)(E), 271(f)(2). Since 2019, Congress has explicitly appropriated funds for CIGP to carry out that statutory obligation, thus incorporating CIGP into USCIS's instruction and training mandate.[4] DHS has never countered the Nonprofits' arguments that CIGP is the *primary* way in which USCIS achieves that mandate. *See* DHS Br. 38; *see also* DHS Resp. Br., ECF No. 63, at 23 (D. Md. May 6, 2025). And because the Act forbids DHS from diminishing any of its functions "not related directly to securing the homeland" without "a specific Act of Congress," DHS's wholesale shuttering of CIGP violated the Act. Opening Br. 47 (quoting 6 U.S.C. § 111(b)(1)(E)).

---

[4] The Nonprofits' opening brief mistakenly stated (at 47) that Congress appropriated funds specifically for CIGP beginning in 2009; the correct year was 2019. Prior to 2019, Congress authorized certain amounts "for the purpose of providing an Immigrant Integration grants program." *See, e.g.*, Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, 125 Stat. 786, 979 (2012). Since 2019, Congress has appropriated funds explicitly for CIGP. *See* Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. 13, 34 (2019).

DHS argues that because the Homeland Security Act was enacted before CIGP's creation, "it is implausible that Congress had this program in mind" when forbidding DHS to neglect or diminish its functions. DHS Br. 37-38. But "the [purported] limits of the drafters' imagination supply no reason to ignore the law's demands. When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 653 (2020). So the scope of DHS's citizenship instruction and training function is not forever limited to what USCIS was doing on day one of DHS's existence. Once Congress began explicitly appropriating funds for CIGP, thereby mandating its existence, the Act's citizenship instruction and training function encompassed it. In terminating CIGP, DHS terminated a program Congress had incorporated into an agency function "not related directly to securing the homeland" without the authorization of "a specific Act of Congress." 6 U.S.C. § 111(b)(1)(E). So it violated the Homeland Security Act.

DHS also argues (at 38) that because they provide a website with some resources, they meet their statutory obligation. But that website itself links to a list of CIGP grantees, and USCIS's own reports highlight that CIGP plays a "major part" in its effort to support citizenship preparation services

and provide information to immigrants.[5] In all events, whether some other resources might theoretically satisfy Section 271(f)(2) in a hypothetical scenario in which Congress had not appropriated funding for CIGP is irrelevant.

### B. DHS does not address the remaining factors for preliminary relief.

The Nonprofits explained that they are suffering irreparable harm and that the balance of the equities and the public interest favor preliminary relief. Opening Br. 49-57. And they explained that this Court has discretion to grant preliminary relief in the first instance because the factors were fully briefed in the district court, *id.* at 41-42, and because no facts are disputed, *see id.* at 17. DHS's one-paragraph response does not contest any facts or argue that the Nonprofits are wrong on any point of law. DHS Br. 45. Instead, it argues that because the district court did not decide those factors, it would be improper for this Court to do so. DHS Br. 45. Each case DHS relies on held that this Court does not make factual findings in the first instance. *Id.* But DHS did not dispute any of the Nonprofits' facts below. So, as with any de novo review, this Court can simply apply the law

---

[5] *See, e.g.*, U.S. Citizenship and Immigr. Servs., Privacy Impact Assessment for the Citizenship and Integration Grant Program, at 1 (May 19, 2017), https://perma.cc/B7R4-QBNH.

to the undisputed facts. And it should exercise the discretion to do so because the Nonprofits are suffering irreparable harm.

## CONCLUSION

The judgment of the district court should be reversed, and this Court should either enter a preliminary injunction or stay under Section 705 of the APA, or instruct the district court to do so.

Respectfully submitted,

*/s/ Bradley Girard*

Niyati Shah
Shalaka Phadnis
Asian Americans Advancing
    Justice—AAJC
1620 L St. NW, Suite 1050
Washington, DC 20036
(202) 296-2318

Bradley Girard
Sarah M. Rich
Adnan Perwez
Robin F. Thurston
Democracy Forward Foundation
P.O. Box 34556
Washington, D.C. 20043
(202) 448-9090

Jose Perez
 Rex Chen
 LatinoJustice PRLDEF
 475 Riverside Dr., Suite 1901
New York, NY 10115
(212) 219-3360

Nickole Durbin-Felix
LatinoJustice PRLDEF
4700 Millenia Blvd., Suite 500
Orlando, FL 32839
(321) 247-6657

*Counsel for Appellants*

July 22, 2025

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 6,105 words including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word 365, set in Century Schoolbook font in a size measuring 14 points or larger.


*/s/ Bradley Girard*

## CERTIFICATE OF SERVICE

I certify that on July 22, 2025 this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

/s/ *Bradley Girard*